# J. C. HAMPTON v. STATE.

No. A-966.    Opinion Filed May 7, 1912.

(123 Pac. 571.)

1.    **TRIAL — Reception of Evidence — Appeal — Discretion of Trial Court.**  (a) The fact that evidence may have been introduced in chief by the state does not necessarily prevent its introduction as evidence in rebuttal.  The introduction of such evidence is a matter of discretion of the trial court, and will not be ground for reversal, unless an abuse of this discretion is shown.

(b)  For evidence which might have been introduced in chief, but which was properly introduced in rebuttal, see opinion.

2.    **HOMICIDE — Evidence — Other Offenses—Conduct of Defendant.**  (a) Any fact is admissible in evidence which tends to shed light upon the intention of a defendant charged with the commission of a crime for which he is upon trial, even though it may tend to prove a separate offense.

(b)  In a homicide case, it is competent to put in evidence the actions, conduct, and general demeanor of a defendant before the killing, for the purpose of proving that he was armed and in a vicious humor, provided only that such conduct is so near the time of the homicide as to tend to show the state of mind of the defendant at the time of the killing.

3.    **WITNESSES—Comments of Counsel—Competency of Witness—Husband and Wife.**  (a) Where it appears from the record that the wife of a defendant who is upon trial is a material witness in his behalf, and he does not place her on the witness stand or account for his not doing so, such failure of the defendant to call his wife as a witness in his behalf is a proper subject of comment to the jury by counsel for the state.

(b)  The statute which prohibits husband and wife from being witnesses against each other is intended to protect confidential communications between them, but does not deprive the husband or wife of the testimony of the other as to any communications between them which would be competent evidence, were it not for the marital relations.

(c)  The statute referred to is for the benefit of the husband and wife, and such communications are rigidly protected by the law from disclosure, except where this protection is waived by the party upon trial; and the husband or wife may waive the provisions of the statute by calling the other party to the marital relations as a witness.  For the reasons supporting this construction of the statute, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Bryan County;*
*Jas. R. Armstrong, Judge.*

J. C. Hampton was convicted of manslaughter in the first degree, and his punishment assessed at 30 years' confinement in the state penitentiary, and he appeals.   Affirmed.

*W. F. Semple* and *Utterback, Hayes & McDonald,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J.   First. Upon the trial of this cause, the state placed Richard Nichols on the stand to testify in rebuttal, and, over the repeated objections of counsel for appellant, said witness was permitted to state that he was present and witnessed the difficulty in which the appellant killed the deceased, and said witness saw the appellant, J. C. Hampton, just before the fatal shot was fired, and that the witness saw the right hand of the deceased at the time he was shot by appellant, and knows what the deceased was doing with his right hand at that time, and that the deceased did not make any motion with his right arm toward his right side or right pants' pocket at the time he was shot by appellant.

Counsel for appellant objected to the introduction of this testimony, on the ground that it was not in rebuttal of anything testified to upon the part of appellant, and should have been introduced as evidence in chief.   Appellant was a witness in his own behalf, and testified to a state of facts which were intended to make out a case of self-defense.   He testified that he was first assaulted by the deceased, and then proceeds to testify as follows:

"A. After he struck that lick, it staggered me back a step, I guess, or such a matter, and he stepped back just a half a step, I reckon, or something like that.   I know he made a step, and throwed his hand back to his right side.   Q. Show the jury the position he was in, Jule.   A. I don't know whether I can show it.   I can't tell just exactly where his hand was.   He was back that way; I couldn't see it.   I heard him exclaim, 'Damn you, I will kill you,' and he had his hand back that way.   Q. What did you do then, Jule?   A. L—   Q. Show them what you did.   A. I

jerked my gun and shot as quick as I could; just jerked it out and shoved it out and shot."

From this it is evident that the appellant tried to make the jury believe that at the time he fired the fatal shot he had reasonable ground to believe that the deceased was attempting to draw some weapon with which to kill him. So it is seen that the testimony admitted on the part of the state was flatly contradictory of appellant's evidence. While the testimony of the witness Nichols might have been introduced by the state as evidence in chief, yet it does not necessarily follow that it should therefore have been rejected as evidence in rebuttal. The introduction of such evidence is a matter of discretion with the trial court, and will not be ground for reversal, unless an abuse of this discretion is shown. *Shires v. State,* 2 .Okla. Cr. 98, 99 Pac. 1100; *Harvey v. Territory,* 11 Okla. 156, 65 Pac. 837; *Cochran v. United States,* 14 Okla. 108, 76 Pac. 672. We do not think that the court erred in admitting the evidence objected to.

Second. Mrs. Lizzie Fahy testified on the part of the state that on the night on which the deceased was killed the witness attended an entertainment or show, that while there she saw the appellant, and heard him say to Mr. Boysdon something about some one taking property away from him at Savannah, and heard appellant say: "I ain't going to stand it; before I will let them have it, I will knock the block off of them. No; I will shoot it off of them." She also heard appellant say in the same conversation, "I was man enough to serve a term in the penitentiary once, and I am man enough to serve another term." Appellant objected to all of this testimony, upon the ground that it was incompetent, irrelevant, and immaterial. The same witness testified that after the show broke up and the parties started home the shooting occurred in which the deceased lost his life. Mrs. Mary Boydson, a witness for the state, testified that she heard the same conversation and statement made by appellant as previously testified to by Mrs. Fahy, and that the conversation occurred an hour or two before the time of the shooting. To this testimony, the same objection was made.

Ira Smith testified in behalf of the state that he was present at the show which was given just before the difficulty in which the deceased lost his life. That he saw the appellant there. That he heard the appellant say: "I have settled that McGregor matter; but old man Lamb is trying to get the rest of what I have got, and he has started something he can't get away with." Witness then said to appellant: "I understand that you and old man Lamb are lodge brothers and belong to the same lodge, and a few minutes conversation with you might be worth a whole lot to me." That appellant said that he and Macon Green and another man was going to get the old man that night, and said, "Will you stay with me?" To which witness replied, "I will do anything I can for you that is right." That witness and appellant then took a drink, and about that time Dr. Rappolee passed along, and appellant says, "There goes the son of a bitch now," and said, "Let him take this, if he can," and produced a gun. That witness told appellant that the man passing was Dr. Rappolee. Appellant then hollered and asked the man if he was Dr. Rappolee. The man replied, "Yes," and appellant asked him to come back and take a drink. That appellant told witness that he was going to get the deceased at his front yard gate, or between the place where the show was being held and the front yard gate. That witness saw a pistol in the hands of appellant at the time. When appellant was upon the witness stand, he was asked with reference to these conversations. He testified that he did use some such language.

In the light of this evidence, we think that the testimony of Mrs. Lizzie Fahy and Mrs. Mary Boysdon was properly admitted, because it tended to prove that the appellant was armed and in a vicious humor just before the killing, and it threw light upon the main transaction.

In the case of *Williams v. State,* 4 Okla. Cr. 523, 114 Pac. 1114, this court held that any fact is admissible in evidence which tends to shed light upon the intention of a defendant in the commission of a crime for which he is upon trial, even though it may prove a separate offense. In a homicide case, it is com-

petent to put in evidence the actions, conduct, and general demeanor of a defendant before the killing, for the purpose of proving he was armed and in a vicious humor; provided that such conduct is so near the time of the homicide as to tend to show the state of mind of the defendant at the time of the killing. For a full discussion of this question and citation of authorities thereon, see *Williams v. State, supra.*

Third. Upon the trial of this case, in the closing argument for the prosecution, counsel for the state addressed the jury as follows:

"Ah, gentlemen, is it not a remarkable fact, further, that he builds his defense upon what his wife told him, and she sits here by his side? Under the law, she is a competent witness in his behalf; but the state is not permitted to reach out and place her upon the stand against him. Her mouth is closed, so far as the state is concerned. If what he says about her—if what he says that she said to him is true, if it is unlike what he says everybody else told him, why in the name of human justice don't he put her on the stand and have her tell about it?"

This argument was objected to by counsel for appellant, and a motion was made requesting the court to exclude it from the jury. This motion was overruled, to which ruling of the court appellant excepted. These facts all appear by proper recitals in the case-made.

In the case of *Rhea v. Territory,* 3 Okla. Cr. 231, 105 Pac. 314, this court held that in a criminal case, where it appears from the record that the wife of a defendant is a material witness in the case in his behalf, and he does not place her on the witness stand, such failure upon the part of the defendant to call his wife as a witness may be commented upon by counsel for the state. We are still of the same opinion.

Counsel for appellant rely upon section 6834, Comp. Laws 1909, which is as follows:

"Except as otherwise provided in chapter on Procedure, Criminal and Procedure, Criminal—Before Justice, the rules of evidence in civil cases are applicable also in criminal cases; provided, however, that neither husband nor wife shall in any case be a witness against the other except in a criminal prosecution for a crime committed one against the other, but they may in

all cases be witnesses for each other, and shall be subject to cross-examination, as other witnesses, and shall in no event on a criminal trial be permitted to disclose communication made by one to the other except on a trial of an offense committed by one against the other."

In their brief, counsel for appellant say:

"If the wife had been called as a witness by the defendant, she could not have divulged communications made by her to her husband, the defendant, at that time, and could not have divulged communications made by her husband to her."

With this contention, we cannot agree. It makes a discrimination against and places a burden upon the marital relation. The true purpose and effect of this statute is to protect confidential communications between the husband and wife, where such communications, if testified to by either husband or wife, would be injurious to the party against whom the evidence was admitted. It would indeed be a narrow and unjust construction of this statute to hold that it deprives the husband of any testimony which his wife could give in his behalf which would be competent, if she was not his wife.

Section 6487, Comp. Laws 1909, is as follows:

"The rule of common law that penal statutes are to be strictly construed has no application to this chapter. This chapter establishes the law of this state respecting the subjects to which it relates, and its provisions and all proceedings under it are to be liberally construed, with a view to promote its objects, and in furtherance of justice."

We therefore hold that the object of this statute, with reference to the testimony of the wife or husband against or in favor of the other, was adopted for the purpose of protecting confidential relations between them, and was intended for the benefit of both husband and wife, and it cannot be construed so as to deprive either of them of any right which they would otherwise have; and that it is competent for the wife or husband to testify as to any communication passing between them which might be beneficial to the party upon trial, provided only that such communication was otherwise free from objections, and that such wife or husband is called as a witness by the other.

Society is interested in preserving the harmony of the marriage relations, and anything which tends to disrupt those relations is to be discountenanced. The law therefore protects all those private confidences which the relation of husband and wife holds as sacred, the disclosure of which might introduce strife, malevolence, and discord into the married life.

For a splendid brief and citation of authorities on the subject of communications made in confidence as privileged communications, see *Hamilton v. Plunkett*, 136 Ga. 72, 70 S. E. 781, 35 L. R. A. (N. S.) 583.

To further illustrate the principle that a statute should be so construed as to accomplish the purpose for which it was enacted, we will take the statute which makes it a crime for any person confined in prison to escape therefrom, or for any person to assist any prisoner so confined in escaping. The statute does not say a word as to the legality of the confinement, or as to the intention with which the escape is made or aided to be made. On the face of the statute, the offense is complete when any person confined in jail as a prisoner escapes or is aided to escape therefrom. Suppose that a man is confined as a prisoner in jail without warrant or the least show of lawful authority, who will contend that it would be an offense for such person to escape from such confinement and to regain liberty? Grant that a prisoner is legally confined, suppose the jail catches on fire, and he escapes therefrom to save his life, or suppose that the jailer is absent, and other persons assist a prisoner so confined to escape from jail, who will be bold enough to say that, under either of these circumstances, a crime has been committed? Yet, in each of them, the letter of the law would be violated. Suppose a husband, upon his return to his home, finds that during his absence a brutal crime has been committed upon his wife, and she informs him that her despoiler had threatened to kill her and her husband, also, if she dared to tell of the outrage committed upon her, and, on account of what had happened and the threat made, the husband kills this man under circumstances which would raise the issue of self-defense, would it not be an outrage upon

humanity and a travesty upon justice to say that the wife was incompetent as a witness in such case in her husband's behalf as to the facts which she had communicated to him? There was an ancient act of Parliament that whoever shed blood on the streets of London should be guilty of a felony. A man fell down in a fit on the streets of London. A doctor was sent for, who bled the man to relieve his malady. This doctor was arrested, tried, and convicted for shedding blood on the streets of London; but, on appeal to the House of Lords, it was declared by that body that, while he had violated the letter of the law, he had not violated its spirit; that the law had been enacted by Parliament for the purpose of suppressing breaches of the peace, affrays, and riots on the streets of London, and that this was its sole purpose; and that it did not include within its penalty any acts which were done for the preservation of the peace or of human life. But we have even a higher authority than this. If we go to the source of all law, sacred writ, we will find written there: "The letter killeth; 'tis the spirit that giveth life." Looking, then, to the intent and purpose of the statute, rather than to its letter, it would be an insult to the intelligence of the Legislature and to American manhood and womanhood to hold that the Legislature intended to refuse to permit a wife to testify as to communications made by her to her husband which would assist in presenting a defense in his behalf. This court will never hold that a husband is not justified in believing his wife and in acting upon communications received from her, and that when he so acts she is not a competent witness regarding such communications in his behalf, provided only that such communications are otherwise competent as testimony.

In the case of *Evans v. State,* 5 Okla. Cr. 643, 115 Pac. 809, 34 L. R. A. (N. S.) 577, Judge Doyle, in discussing privileged communications made by a client to his attorney, says:

"The statute is for the benefit of the client, not the attorney; and such communications are permanently protected from disclosure, except where the client waives the protection."

The same fundamental rule applies to all privileged communications. The husband or wife may waive the provisions of the statute.

We believe that the remarks made by the prosecuting attorney in this case were fully justified by the evidence; and we believe the court did not err in refusing to exclude them from the jury. This court stands uncompromisingly for the enforcement of the law; and when it is shown by the record that a party charged with crime is guilty, and that he has been fairly convicted, this court can be depended upon to sustain such conviction.

We have examined the record carefully, and we have no doubt as to the guilt of appellant. The only question is as to whether or not he should have been convicted of murder or manslaughter. The jury having seen fit to find him guilty of the lower offense, he should be exceedingly thankful therefor. We do not hesitate to say that, if the jury had convicted him of murder and assessed his punishment at death, it would have been sustained. There is considerable evidence in the record tending to show that the deceased and the defendant were both bad men; but this in no wise justifies or mitigates the offense committed.

We find no error in the record. The judgment of the lower court is therefore, in all things, affirmed.

DOYLE, J., concurs. ARMSTRONG, J., having presided at the trial of appellant in the court below, was disqualified, and did not participate in the consideration and decision of the case in this court.