# HENRY A. SEIGLER v. STATE.

No. A-1951.  Opinion Filed October 17, 1914.

1.  **HOMICIDE — Murder—Indictment and Information—Sufficiency** For an information charging murder, approved and held sufficient, see opinion.

2.  **CONTINUANCE—Absent Witnesses—Cumulative Evidence.** The denial of an application for continuance, although sufficient on its face, will not justify a reversal of a judgment of conviction when, under the light of other proof in the record, it is clear that the evidence desired from the absent witness would have been of no value if produced, or at best merely cumulative.

3.  **HOMICIDE—Self-Serving Declarations—Res Gestae.** Declarations which are self-serving in their nature and which do not form a part of the res gestae constitute no part of competent proof in the trial of a homicide charge.

4.  **SAME—Self-Defense.** When the issues in a homicide case are based upon the contention that the plaintiff in error acted in his necessary self-defense from actual and impending danger, proof of statements made by the deceased relative to remote difficulties he had had with others are not properly admissible; at least, when there is no contention based upon apparent danger, and when the state's case must stand or fall upon the homicide being established as a deliberate, unwarranted, and premeditated murder. The purpose of this character of testimony in all cases is limited to a proper and well defined sphere.

5.  **SAME—Inspection of Scene by Jury—Discretion.** The rulings of the trial court in sending or declining to send the trial jury to the scene of a homicide for the purpose of permitting them to make a personal inspection of the premises and surroundings will not be disturbed by this court, unless it is made clearly to appear that such court acted arbitrarily and abused its discretion under circumstances which tend reasonably to indicate that the substantial rights of the person on trial were prejudiced thereby.

6.  **WITNESSES—Age—Competency—Discretion of Court.** (a) Objections to receiving the testimony of a witness on the ground that he was of such tender age as to be incompetent, are addressed to the sound discretion of the court.

(b) In reviewing an assignment of error based on this contention this court will examine carefully the whole record of the examination of such witness, testing his intelligence and qualifications as well as the testimony given by him at the trial, and unless a clear abuse of discretion is apparent the rulings of the trial court will not be disturbed.

(c) In this case the objection to receiving the testimony of witness Verne Stanford on this ground is wholly without merit, and the trial court properly permitted him to testify.

7.    **EVIDENCE—Rebuttal—Definition.**    (a) When the state makes out a clear case in chief, the fact that certain testimony was reserved for rebuttal which would have been admissible in establishing the case in chief but which is clearly in rebuttal of the material defense, or testimony introduced in defense, does not render the same inadmissible in rebuttal.

      (b) Rebuttal testimony is properly that testimony which is given to explain, repel, counteract, disprove, or destroy facts given in evidence by an adverse party. Any evidence may be given in rebuttal which is a direct reply to that produced by the other side or a contradiction thereof, or which tends to destroy the effect of the same. For testimony held to be admissible in rebuttal, see opinion.

8.    **APPEAL—Instructions.**    Instructions of the court are to be considered as a whole, and when so considered, if they do not disclose prejudicial error, will be sustained on appeal.

      (b) Assignments of error based on the refusal to give requested instructions when the record discloses that the material and proper elements of the instructions are given by the court, are without merit.

9.    **NEW TRIAL—Newly-Discovered Evidence—Appeal—Review.**    (a) A motion for a new trial based on the ground of newly-discovered evidence is addressed to the sound discretion of the trial court, and, unless an abuse of that discretion is disclosed by the record brought here for review, the rulings of the trial court will not be disturbed.

      (b) The entire record of the trial, as well as the record made upon the hearing of the motion for a new trial on the ground of newly discovered evidence, will be examined by this court in determining whether or not the trial court properly exercised its discretion in passing upon such motion.

      (c) For facts which sustain the rulings of the trial court in denying a motion for a new trial on the ground of newly discovered evidence, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Comanche County;*
*J. T. Johnson, Judge.*

Henry A. Seigler was convicted of murder, and appeals. Affirmed.

*Stevens & Myers* and *J. F. Thomas,* for plaintiff in error.

*C. J. Davenport,* Asst. Atty. Gen., *John Fain,* Co. Atty., and *W. C. Henderson,* Asst. Co. Atty., for the State.

ARMSTRONG, P. J. The plaintiff in error, Henry A. Seigler, was convicted at the May, 1912, term of the district court of Comanche county, on an information charging him

with the murder of W. A. Stanford, and the death penalty imposed as his punishment. The information upon which the conviction is based is as follows:

"I, J. A. Fain, county attorney of the county of Comanche and state of Oklahoma, duly authorized and empowered by law to inform of offenses committed and triable within said county and state, in the name and by the authority of the state of Oklahoma, come now here and give the court to understand and be informed, that at and within said county and state, on the 8th day of January, 1912, Henry A. Seigler, then and there being, did then and there, willfully, unlawfully, purposely, feloniously and with malice aforethought, and without authority of law, and with the premeditated design then existing in the mind of the said Henry A. Seigler to effect the death of a certain person in being, to wit: W. A. Stanford, with certain deadly and dangerous weapons, to wit: a rock weighing about three pounds, did strike the said W. A. Stanford in and on the head and body, and with a certain shotgun did shoot bullets and leaden shot into the face, head and body of the said W. A. Stanford, and so made mortal wounds in and upon the face, body and head of the said W. A. Stanford, of which mortal wounds so made as aforesaid, the said W. A. Stanford then and there on the 8th day of January, 1912, in the county of Comanche and state of Oklahoma, did die, as was intended by the said Henry A. Seigler he should do; and so the said Henry A. Seigler, at the time and place aforesaid, and in the manner aforesaid, feloniously, and with malice aforethought, did without authority of law, and with a premeditated design to effect the death of the said W. A. Stanford, him, the said W. A. Stanford kill and murder, contrary to the form of statute in such case made and provided, and against the peace and dignity of the state."

A demurrer was filed by counsel for plaintiff in error, which was overruled by the court.

Many assignments of error are set out in the petition in error. Most of them, however, are wholly without merit.

The homicide out of which this conviction grew occurred in the northwest part of Comanche county on the 8th day of January, 1912. Sometime prior the plaintiff in error and the deceased had made settlements on the same quarter section of land, each in the endeavor to enter it under the homestead laws of the United States. The settlements were apparently made at the

same time.   The plaintiff in error made his first settlement some distance from where the deceased made his.   Later, plaintiff in error built a hut at or near the place upon which the deceased entered the premises and attempted to establish his settlement. There was a small log cabin on the premises at the time these men began their efforts to acquire the land under the homestead laws of the United States.   This cabin apparently was claimed by one Spencer.   Under rulings of the United States land office Seigler was awarded the homestead entry.   Stanford immediately filed a contest in which Spencer was joined.   Some other person was also joined with Seigler.   Pending a determination of the contest proceedings Stanford went upon the premises and occupied the log cabin, and in addition placed thereon a tent immediately adjoining the cabin.   A space of only a few feet intervened between the cabin occupied by Stanford and the hut erected by plaintiff in error.   After making original settlement it appears that the deceased went away to visit his family, who lived at Coyle, Oklahoma, and upon his return the plaintiff in error had put up some wire which attached to the log cabin. This wire was taken down by the deceased.   The plaintiff in error was away from home at work and returned that night.

The testimony on behalf of the state and that on behalf of the accused differ in many material respects from this time until after the homicide.   The testimony on behalf of the state tends to establish the fact that the plaintiff in error was a large man physically, possessed of an overbearing disposition; that upon finding the deceased on the premises he ordered him to take down his tent and get his belongings off the place, using emphatic language and profanity.   The deceased declined to comply, contending that he had a lawful right to joint occupancy pending the determination of the litigation.   Upon another occasion the plaintiff in error demanded the deceased to move away and told him that the quarter section was too small for both of them to live on.   Numerous threats to kill the deceased and threats which implied that he intended to kill him if he didn't abandon the premises were introduced in evidence by the state.   Other circumstances were introduced which tended to show that plain-

tiff in error had attempted hostile demonstrations against the deceased. Growing out of the differences between these two men and their families several complaints were filed by deceased against the plaintiff in error, none of which were prosecuted to a successful termination. On the day prior to the homicide the deceased had filed two or three additional complaints against the plaintiff in error. On the morning of the homicide the deputy sheriff in whose hands warrants, based on the complaints, had been placed, called the plaintiff in error on the telephone of one Allen, a neighbor, advising that he had the warrants, and arranged for the plaintiff in error to come down to meet him at the office of the township justice of the peace. Plaintiff in error went back to his house and cut a little wood for the use of his wife, and made preparations apparently to go to the office of the justice of the peace. He took his gun and left the house, and, according to the proof introduced by the state, also took a large rock in his hand. The deceased, Stanford, was cutting wood at the corner of his cabin, only a few feet from the door of the hut occupied by the plaintiff in error. The plaintiff in error came out of his hut, walked directly toward where Stanford was, and just before reaching him was seen by Mrs. Stanford, who opened the door and ran out, whereupon the plaintiff in error threw the rock and hit the deceased, who was stooping over chopping wood, on the head, fractured his skull, and knocked him down. Mrs. Stanford interceded with the plaintiff in error and begged him not to kill her husband, whereupon he pointed the gun which he had brought from his hut into her face. She stepped back a short distance. In the meantime the deceased had turned over on his back and had raised up his head slightly. The plaintiff in error pointed the gun immediately upon him and fired, the charge of shot entering the face to the left of the nose, and through the lips; death ensued immediately.

A little son of the deceased, Verne Stanford, was out in the yard where his father was cutting wood at the time of the homicide. Two other children had gone to a well or spring a few hundred yards away for water. As soon as they returned to the house the children were sent to notify neighbors living in

the community, a few of whom arrived before the officers reached the scene. The deceased was found lying on his back. The ax with which he had been cutting wood was under his body, the blade being about his hips, the handle extending out from his right side. The right hand of deceased was lying across the ax handle on his right side; his left hand was folded on his breast. A number of the teeth of deceased were picked up around the body. The stove wood which he was cutting was lying under and near his body.

Mrs. Stanford and her little son testified to the facts occurring immediately before and at the time of the homicide, each of whom say that no other persons, except themselves, the deceased, and the plaintiff in error, were present. Other witnesses testified to the wound on the head of the deceased, and in response to questions of the county attorney certain witnesses testified there was a large knot on the back of the deceased below the shoulder.

The plaintiff in error and his wife testified in his behalf. Each says that they were both present. Their testimony is to the effect that the plaintiff in error had started to meet the officer according to his promise; that he took his gun and dogs and started along the usual route; that as he approached the cabin of the deceased the deceased was chopping wood; that Mrs. Stanford ran out of the cabin, grabbed hold of plaintiff in error, and began to excoriate him for the way he had treated their family; that the little son, Verne Stanford, began to hack him in the back and on the legs with a buck saw; that the deceased drew his ax and advanced several steps toward him with the ax uplifted in a manner which induced in him, the plaintiff in error, the belief that he was about to be killed; that thereupon he shot the deceased; that the muzzle of the gun was elevated; that the shot ranged upward and that he killed Stanford in his necessary self-defense; that he did not strike deceased with a rock and had no rock or other heavy instrument in his hands at the time.

Immediately after the shot was fired the plaintiff in error went to the home of a near neighbor, called the deputy sheriff

whom he had agreed to meet at the office of the justice of the peace, and advised him to come up at once. The officer asked him what the trouble was. He replied, "Trouble enough; come on up and see." This neighbor, Allen, and a brother who lived with him, accompanied the plaintiff in error back to the scene of the homicide, where the plaintiff in error pointed out certain objects, among them a buck saw lying in the yard. In his testimony the plaintiff in error denied each and every threat to kill or injure the deceased that was proved by the state, but admitted each and every conversation in which the state contended the threats were made. He also admitted the times and places and the persons with whom the conversations were had, there being no material difference except his denial that any threat was made in any of the conversations.

Other witnesses testified for the plaintiff in error, among them an undertaker who said that he saw the knot on the back of the deceased, saw it removed, and that it was a fatty tumor.

On rebuttal the state introduced the testimony of physicians who held a *post mortem* examination upon the body of the deceased. Their testimony tended to show that the wound in the back of the head was inflicted with a rugged instrument and fractured the skull from the crown of the head to the base thereof, and that this was in itself a fatal wound and was made by an external injury; that the shot which entered to the left of the nose and through the upper lip of deceased ranged, downward and lodged in the muscles of the neck; that none of the shot ranged upward and none of them penetrated the brain. These physicians removed the skull and brain and made a thorough examination, and all agree that no shot entered the brain, and nothing indicated any upward range or any deflection of the charge. The tongue was practically severed at its base.

Verne Stanford was called as a witness by the state and testified that he was eight years old; that he was in the yard at the time of the homicide; that he didn't have the buck saw out in the yard at that time; that he did not attack the plaintiff in error with the buck saw, and that his mother did not

take hold of said plaintiff in error before he threw the rock and fired the shot; that he brought a buck saw out into the yard after his father had been killed and left it there when his mother told him to run over to a neighbor's for assistance. A large rock was found near the body of deceased. There were a number of other rocks in the yard, but they were imbedded in the ground and could not be removed on account of the frozen condition of the earth. A large pile of rocks similar to the one found near the body of deceased were shown to have been lying on the ground near where the plaintiff in error had been cutting wood.

On behalf of plaintiff in error certain testimony was introduced in sur-rebuttal tending to show that there was a blood splotch on a certain log opposite where plaintiff in error contended deceased was standing when he was shot. The log from the hut was introduced in evidence, and, according to the testimony of a physician who made a microscopic examination thereof, the blood splotch was human blood. One witness testified that he noticed the blood on this log on the day of the homicide and that it appeared to him to be a fresh stain.

The state introduced witnesses, among them Justice of the Peace Meers, who said he examined the log on the day of the homicide; that he took no testimony in reference to it because the blood was old and had been dry a long time. Other witnesses for the state testified that a rabbit and o'possum had been fastened to a nail driven in one of the logs of the cabin near where this blood splotch was found and had been skinned and dressed a few days before the homicide.

After the conviction, counsel filed a motion for a new trial, and, among other grounds, set out an allegation of newly discovered evidence. They had had certain tests made of the dried blood found on the log of the hut that was introduced in evidence. These tests were made by an army surgeon at Ft. Sill and the state chemist at Norman, Oklahoma. Each of them testified that in his judgment the splotch was made by human blood. Upon this testimony and supporting testimony as to diligence the allegation of newly discovered evidence was predi-

cated. The motion for a new trial was overruled by the trial court, the death sentence was pronounced in accordance with the verdict of the jury, and the cause appealed to this court. The appeal was filed on March 26, 1913, but no briefs were filed on behalf of plaintiff in error until the 21st day of March, 1914.

The first assignment of error is based on the contention that the court erred in overruling the demurrer of the plaintiff in error to the information in this cause. The demurrer was wholly without merit and frivolous, and was properly overruled.

The next assignment of error presented is based on the contention that the court erred in overruling a motion for continuance. The affidavit for continuance was based on the ground that Albert Decker had been served with a subpoena to attend as a witness, but that he had left the jurisdiction of the court and could not be obtained at the trial. The application sets out that if Decker were present he would testify that he heard a conversation between plaintiff in error and Art Hinson; that the plaintiff in error did not say that if Stanford interfered with him any more he would make him look more life a half-breed coyote than he was; that the plaintiff in error did not state in substance or words that he could not stand to be dragged into court by Stanford any more, nor that if Stanford pulled him any more he, Stanford, would not be at the trial.

In the light of other proof in the record this evidence would not have been of value if produced. *Bethel v. State,* 8 Okla. Cr. 61, 126 Pac. 698.

The next assignment of error is that the court erred in refusing to permit witness Allen to testify to certain conversations which he had had with plaintiff in error. Counsel attempted to introduce by this witness statements that he had been associated with the plaintiff in error intimately for a long time and that he never heard him say anything against the deceased nor manifest any anger or use any violent language toward the deceased. The objection to this character of examination was properly sustained. It clearly appears from the record that this

witness was a strong partisan of plaintiff in error. Such statements were not offered as part of the *res gestae* and could have only been self-serving statements, which constitute no part of competent proof under the issue on trial.

The next assignment of error is based on the contention that the court erred in refusing to permit witness Allen to testify to a certain statement which had been made to him by the deceased relative to having shot a man sometime in his past life in the state of Texas, and spending $1,800.00 getting out of the trouble; that upon another occasion he had drawn a gun on a banker who refused to pay him for some work, and forced a collection of his debt, and one or two other similar transactions. This testimony was not admissible, and was properly excluded by the trial court. It was entirely too remote and worthless to be of value as indicating any ill feeling on the part of the deceased toward the plaintiff in error. On the trial of this cause the sole and only reliance of the plaintiff in error, was that he acted in his necessary self-defense from an assault then being made upon him with a deadly weapon, and not in the reasonable apprehension of danger on account of threats or the violent disposition of deceased. Under no state of the case presented by the record was this testimony competent. This character of testimony would be admissible only for the purpose of tending to show that the accused acted in a reasonable manner and under circumstances which disclosed an apparent danger of immediate bodily harm. His testimony and alleged self-defense were not based on apparent danger, but on actual and impending danger. If the state of facts produced were true the homicide was justified on the ground of necessary self-defense.

The next assignment of error urged is based on the contention that the county attorney was guilty of misconduct in making objection to the introduction of the foregoing testimony, by using the language: "I think it is time this rot was stopped, it violates every rule of evidence." The rulings of the court disclosed by the record indicate no prejudicial error. The use

of such language by counsel on either side should not be indulged in, whether justified or not.

The next assignment of error to be considered is that the court erred in declining to send the jury to the scene of the homicide for the purpose of permitting them to inspect the premises and surroundings. This contention is wholly without merit. The scene was some 25 or 30 miles from the county seat, in a remote and mountainous country. The trial judge, in considering the application, stated that he had no means of transporting the jury in a body to the scene; that nothing had developed in the trial to indicate any necessity for such action; that he had no objection to sending the jury to the scene if they desired to go and would do so at any time a request might be made by the jury before a verdict was reached that they would like to make a personal inspection of the scene of the homicide. There is not a single suggestion in the record that would indicate in the remotest degree that any information or light would have been gained by such a visit. It would have been a useless expenditure of the taxpayers' money of Comanche county and an unnecessary hardship on the officers and jurors to have required such a trip. The rulings of the trial court in declining the request were, in our judgment, entirely proper. A plat of the scene was made by a civil engineer and introduced in evidence. Photographs of the buildings and surroundings were also introduced and detailed explanations of all made by experts. A man of ordinary intelligence could have understood all the surroundings of the homicide from the testimony.

The next assignment of error is based on the contention that the court erred in permitting witness Verne Stanford to testify, on account of his tender age. After a thorough and grilling examination by counsel for plaintiff in error this witness disclosed a remarkable degree of intelligence for a person of his age and opportunities. He showed entire frankness and a thorough understanding of his duties as a witness. Objections to this character of testimony are addressed to the sound discretion of the court, and, unless an abuse of that discretion is shown, this court will not reverse a conviction on that

ground. Upon a careful examination of the testimony of this child and the grilling he received at the hands of counsel we are of opinion that the trial court exercised its discretion properly. The witness apparently was a much more capable and intelligent one than many persons of mature age. The assignment is without merit.

It is further contended by counsel that the testimony of this witness was not competent because it was not proper rebuttal. This contention is also without merit. The major portion of his testimony was wholly in rebuttal. Certain incidental statements possibly were not strictly rebuttal. The plaintiff in error had testified in his own behalf that this witness assaulted him with a buck saw. The witness testified that he did not make such an assault; that the buck saw was not even in the yard at the time. Plaintiff in error testified that he did not throw a rock and strike the deceased. This witness testified that he did throw a rock and strike the deceased. Plaintiff in error had also testified that the deceased was standing up in the act of striking him with an uplifted ax when the shot was fired. This witness testified that the deceased was lying on the ground when he was shot. We are unable to determine under what theory this evidence would not be considered rebuttal. Counsel fail to advance any reason in their argument. *Hampton v. State,* .7 Okla. Cr. 291, 123 Pac. 571.

The next assignment of error is based on the contention that the court erred in permitting Drs. Meeker, Gooch, and Broshears to testify to the facts disclosed by their *post mortem* examination. This assignment is based on the contention that these facts should have been introduced by the state in the case in chief and that plaintiff in error was greatly prejudiced by reason of the fact that they were reserved for rebuttal. In support of this contention no authority is cited in the brief and no reasonable argument .is advanced. In this case the killing was admitted; the defense was that of self-defense. All the state was required to prove was the unlawful killing and the circumstances thereof. This was done. In the defense, testimony was introduced tending to establish facts in justification

of the killing. Among them was testimony by plaintiff in error himself to the effect that he had the butt of the gun below the waist band of his pants, the muzzle of the gun elevated, and shot the deceased when the deceased was approaching him in an effort to strike him with an ax, and that the shot ranged upward. This testimony in rebuttal exploded the theory of defense and was necessarily strong testimony tending to establish the real facts in connection with the homicide, and in a great measure must have convinced the minds of the jury that the homicide was a ruthless murder. The fact that testimony is admissible in chief does not necessarily exclude it in rebuttal. This testimony was in rebuttal of the theory of self-defense interposed by counsel on behalf of plaintiff in error, and shattered his testimony and his contention that he killed the deceased at a time when he was being assaulted by him. It also strengthens the contention of the state that the deceased was lying on the ground when he was shot. This defense was evidently made upon the theory that the state expected to rely on the contention that the rock thrown by the accused hit him in the back and made the knot which was afterward shown by them to be a fatty tumor and not made by a rock. The proceedings disclose the fact that the county attorney knew all the while that the knot was a tumor and at no time contended that it was made by the rock. The only contention disclosed is that he relied on the theory that the rock was thrown by plaintiff in error and fractured the skull of the deceased, and that he was lying on his back in a helpless condition when he was shot in the face by plaintiff in error. The testimony, in our judgment, was properly reserved for rebuttal and the objection to its introduction properly overruled by the trial court.

Assignments based on certain other evidence in rebuttal are urged, but they are all covered by the disposition of the foregoing. We fail to find any error in the proceedings of the trial court in reference to the introduction of testimony. In fact, out of abundant precaution, the trial court was eminently fair to the plaintiff in error.

Certain assignments are stated in the brief as being based upon prejudice growing out of instructions of the court. An examination of the instructions indicates that they are entirely fair. Counsel present no plausible argument to the contrary. Not an authority is cited and not a line of argument pointing out a defect applicable to the state of facts disclosed by the record. Taken all together (and instructions must be considered as a whole), they were fair and properly submitted all issues.

Certain assignments are based on the failure of the court to give instructions requested by counsel for plaintiff in error. An examination of the record discloses that all material elements of the instructions requested were given, and no error is disclosed by the action of the court in refusing to give the requested charges.

The next and only assignment urged which was entitled to serious consideration by the trial court is based upon an allegation in the motion for a new trial on the ground of newly discovered evidence. The examination of Dr. Farrinbaugh, an army surgeon stationed at Fort Sill, was lengthy and thorough. From this testimony there is no doubt that the blood he examined and which the testimony indicated was taken from a log in the wall of the cabin occupied by the deceased, was human blood. He is supported in this contention by Dr. DeBarr, state chemist. There is other testimony in support of the contention, all, however, bearing on the diligence of counsel in connection with this feature of the case and in support thereof by other witnesses. In order for this court to be in position to reverse this conviction on this contention it would be necessary for us to say that the testimony offered by these witnesses is such that the jury in all reasonable probability would have reached a different conclusion had the same been offered at the trial. *Howey v. State,* 9 Okla. Cr. 453, 132 Pac. 499. It will be remembered that the state's witness Meers, justice of the peace of the township in which the homicide occurred, testified at the trial that he discovered this blood in question upon the log in question on the day of the homicide, and that he made no note of it in the minutes taken by him at the inquest, and ex-

amined no witnesses in reference to it, for the reason that it was old dry blood and apparently had been on the log for a long time. This witness was apparently frank and not a partisan of either side. Another witness, who was a partisan of plaintiff in error and whose testimony as disclosed by the record in many particulars was impeached, shows that he discovered the blood on the log and that he thought it was fresh on the day of the homicide. This latter witness had been in attendance at the examining trial, acting as clerk in taking down the testimony at the inquest, had been at all times in attendance at the final trial in the district court, and only at the close of the trial did he divulge the information to counsel. It will be remembered also that a local physician in Lawton testified that in his opinion the blood in question was the blood of a human being. He admitted, however, that it was possible for him to be mistaken. The two experts examined on the motion for a new trial were very positive in their statements that it was human blood. In our judgment the state could have admitted that the blood in question was human blood—that is, all the testimony would have established—and then a verdict of guilty would not only have been warranted under all the facts, but a reasonable jury could not have concluded otherwise than that this plaintiff in error was guilty of the ruthless and wanton murder of W. A. Stanford. This being true, there was no error committed and no abuse of discretion by the trial court in denying the motion for a new trial on this or other grounds. *Martin v. Ter.*, 18 Okla. 370, 90 Pac. 13; *Smiley v. Ter.*, 15 Okla. 314, 81 Pac. 433; *Hurst v. Ter.*, 16 Okla. 600, 80 Pac. 280; *Harvey v. Ter.*, 11 Okla. 156, 65 Pac. 837; *Ryan v. State*, 8 Okla. Cr. 623, 129 Pac. 685; *Drew v. State*, 6 Okla. Cr. 348, 118 Pac. 377; *Johnson v. State*, 5 Okla. Cr. 1, 112 Pac. 760; *Caple v. State*, 3 Okla. Cr. 621, 105 Pac. 618.

This record is voluminous, containing about 1,500 pages, all of which have been read and carefully examined by this court, and we are unable to find from a careful and studious examination of the same where a single right of the accused was denied.

The judgment of the trial court is therefore in all things affirmed.

It appears from the record that while this appeal was pending the act of March 29, 1913, regulating the infliction of the death penalty, became effective. As the day fixed for the execution of the judgment and sentence has passed, the cause is remanded to the district court of Comanche county for the purpose of appointing another day for the execution of the judgment, as provided by secs. 5979 and 5980, Rev. Laws (Procedure Criminal). Proceedings to be had in accordance with the rule prescribed by this court in the case of *Alberty v. State,* 10 Okla. Cr. 616, 140 Pac. 1025.

The warden of the penitentiary will surrender the plaintiff in error to the sheriff of Comanche county, who will hold him in custody pending the proceedings in the trial court, and until his custody is changed by due course of law.

DOYLE, J., concurs. FURMAN, J., absent and not participating.