STATE OF NORTH DAKOTA, Respondent, v. ALYCE BELL,
Appellant.

(272 N. W. 334.)

. . ."

Opinion filed March 29, 1937.

*F. E. McCurdy,* for appellant.

*P. O. Sathre,* Attorney General, and *A. M. Kuhfeld,* State's Attorney, for respondent.

NUESSLE, J. The defendant was informed against on a charge of forgery. She entered a plea of not guilty; was tried by a jury which returned a verdict of guilty; her motion for a new trial was denied; and judgment of conviction was entered on the verdict.

The facts shown as the state's case may be stated briefly as follows: The Powers Elevator Company is a corporation engaged in the business of buying and selling grain. In 1935 it had an elevator at Chama, a siding near Sentinel Butte, North Dakota. Angus Bell was

the agent for the purpose of buying grain brought to such elevator. As agent he had authority to issue drafts upon the elevator company in payment of grain bought by him, but not for any other purpose. The defendant, Alyce Bell, was his wife and lived with him at Chama. One Arthur Tuttle lived with the Bells and helped about the elevator. In receiving grain, Bell would ascertain the quantity and quality and issue a scale ticket therefor in triplicate, giving the original to the buyer. One copy was sent to Minneapolis to the home office of the elevator company and the second was retained by Bell. When the grain was sold, Bell was authorized to and did issue drafts for the purchase price. The duplicate tickets were then sent in to the Minneapolis office to show the purchase of the grain and the drafts were paid when presented. Francis Hollar, a young man of about nineteen years of age, lived with his father on the latter's farm near Chama. On or about September 24, 1935, as he was working about the farm, Mrs. Bell, accompanied by Tuttle, drove up to him in an automobile. She said: "Do you want to make some easy money?" He replied that he did, and she then said: "Well if you will sign this slip of paper I will give you some money." A yellow paper was then presented to Hollar, folded so as to show the line on which to affix his signature. He did not examine the paper but wrote his name on the line indicated and handed the paper back to Mrs. Bell. She took it, gave him five dollars, and then drove away. In fact the paper was a draft ostensibly issued in payment of grain received from Hollar by the Powers Elevator Company at Chama. A few days later, Hollar, curious as to why he had been given five dollars for signing his name to a paper, went to the Bell home and asked Mrs. Bell about it. Tuttle was there at the time. When Hollar inquired about it, Mrs. Bell and Tuttle explained that someone (naming him) had brought in some "hot wheat," that is, wheat that had been stolen; that the paper which Hollar signed was for this wheat; that the man who brought the wheat in did not want his name on the paper. Both at the time Hollar endorsed the draft and later when he inquired about the transaction, Mrs. Bell told him that he should not say anything about it. Thereafter Mrs. Bell took the draft and attempted to cash it. The banker required her to endorse it, which she did. Thereupon

she was paid the amount, $91.00, for which the draft was drawn. The draft was signed by Angus Bell. In fact, Hollar had never delivered any grain to the elevator, nor had the person who Mrs. Bell said had delivered the "hot wheat." At about this time, or shortly thereafter, Mrs. Bell took up several bad checks which Tuttle had theretofore put in circulation. About the first of October, Mrs. Bell sent a letter to the vice president of the elevator company requesting him to come out to Chama and examine Bell's check book. This letter reads as follows:

"Will you please come out here yourself as soon as possible and examine Ang's check book. I hate to complain to you like this, but you won't understand the situation here 'til you come out and look the books over. It's checks every day or so and yesterday he wrote one for over $20.00 and went to Glendive and didn't get back 'til 4 this morning and booze you never seen the equal. I moved out here to try to make the best of things but it's no use. Angus promised me he wouldn't drink if I'd move out but he is getting worse every day. Please come out and get your eyes open."

In fact this letter was written in August but was not sent until October.

Mrs. Bell took the stand as a witness in her own behalf. She testified she procured Hollar's signature and cashed the draft at the request of Bell; that he told her Hollar wanted an advance payment; that she acted innocently and in good faith in what she did. She said that she turned over to Bell the money she procured from the bank for the draft. The state did not call Bell as a witness as Mrs. Bell refused to consent that he be examined as a witness against her. With reference to the checks that were issued by Tuttle and which Mrs. Bell took up, she said she had procured the money with which to do this from Tuttle's mother.

Bell and Tuttle were both convicted on account of misappropriating funds of the elevator company. The defendant, Alyce Bell, was also informed against and tried on a charge of forgery under § 9906, Comp. Laws 1913, which provides:

"Every person who, with intent to defraud, utters or publishes as true, any forged, altered or counterfeited instrument, . . . the

forging, altering or counterfeiting of which is hereinbefore declared to be punishable, knowing such instrument . . . to be forged, altered or counterfeited, is guilty of forgery in the same degree as if he had forged, altered or counterfeited the instrument . . . so uttered. . . ."

She was convicted and perfected the instant appeal.

The defendant on her motion before the trial court for a new trial and here in support of her appeal, specified many errors on account of rulings of the court with respect to the admission of testimony and other matters. She also challenged the sufficiency of the evidence to support the verdict. But the order denying her motion for a new trial recites:

". . . And both sides having presented authorities to the court and having argued the matter presented, and the Defendant in this motion for a new trial having relied on two propositions, viz.: (1) That the evidence does not show facts sufficient to establish as a fact that the defendant knew the check uttered by her was forged, and (2) That the evidence does not establish forgery for the reason that the wheat check was not a forgery in fact but was merely a fraudulent instrument, and . . . . Now, therefore, it is hereby ordered that the motion for a new trial made by the Defendant be and the same hereby is in all things denied, and that the Memorandum Opinion filed by the Court herein be and the same hereby is made a part of this order denying said motion for a new trial.

And in his memorandum opinion the trial court said:

"The attorney for the defendant in his argument argued just two propositions:

"First, that the evidence does not show facts sufficient to establish the fact that the defendant knew that the wheat check uttered by her was forged; and, Second; that the evidence does not establish forgery, in this, that the wheat check was not in fact a forgery, but was merely a fraudulent instrument. . . ."

Defendant's contentions on this appeal are, first, that the instrument in question was one that Bell was authorized and empowered to issue in payment of grain bought and that therefore there was no forgery as the same is defined by § 9895, Comp. Laws 1913; second,

that even though the signing and issuance of this instrument constituted a forgery on Bell's part within the purview of § 9895, nevertheless Mrs. Bell had no knowledge as to the falsity of the instrument or that the same was a forgery and that there is no evidence to establish either such knowledge on her part or an intent to defraud so as to constitute the offense of forgery under § 9906, supra; and, finally, that there was reversible error because during the trial of the case and while Mrs. Bell was on the witness stand the state inquired of her as. to whether she would consent to have her husband testify with reference to the delivery of the draft to her and other matters pertinent thereto. The defendant's contention in this regard is that this was done in a way that could not help but be prejudicial; that she had a right as a matter of privilege to refuse to permit her husband to testify and that the exercise of this privilege should not be forced in such a way as to be prejudicial to her; that the state by its inquiry in the manner in which it was made prejudiced her in the eyes of the jury; further, that in the course of the argument the state's attorney commented on the fact that Bell had not testified in the case.

Section 9895, Comp. Laws 1913, provides: "Every officer, and every agent of any corporation, municipal or otherwise, of any joint stock association formed or existing under or by virtue of the laws of this state, or of any other state, government or country, who, within this state, willfully signs or procures to be signed with intent to issue, sell or pledge, or to cause to be issued, sold or pledged, or who willfully issues, sells or pledges, or causes to be issued, sold or pledged, any false or fraudulent bond or other evidence of debt against such corporation or association, or any instrument purporting to be a bond or other evidence of debt against such corporation or association, the signing, issuing, selling or pledging of which has not been duly authorized by the board of directors or common council or other managing body or officers of such corporation having authority to issue the same, is guilty of forgery in the second degree."

It is the state's contention that the execution of the draft in question by Angus Bell constituted a forgery under the terms of this section. On the other hand, the defendant insists that Bell was the authorized agent of the elevator company; that as such he had authority to issue drafts for the purchase of grain; that the instrument in

question was a draft such as he was authorized to issue and that the same was signed with his genuine signature; that there is a distinction between the false making of an instrument and the making of a false instrument; that the one is forgery and the other is not, and that therefore in the instant case there was no forgery.

It seems to us that it is the purpose of the statute to penalize the making and issuance of an instrument falsely purporting to be an evidence of debt of a corporation without the authority of the managing officers of such corporation. If the instrument is false, it is within the purview of the statute. The fact that the signature to the instrument is genuine can make no difference. Neither can the fact that the individual making and issuing the same had authority to do so where it was made and issued to pay for grain bought. And it is immaterial that the making of a false instrument would not constitute a forgery under the common law. The legislature has the power to define forgery as it will. It can say what acts will constitute the offense. It is not restricted in defining the crime to those cases where the instrument is made in the name of another. In other words, it can declare the making of a false instrument to be a forgery as well as the false making of an instrument. See State v. Hayes, 37 S. D. 530, 159 N. W. 108, where the South Dakota court so held in considering a statute identical with § 9895, supra. See also State v. Craig, 54 N. D. 5, 208 N. W. 394. There forgery was charged under § 9903, Comp Laws 1913 on account of the making of a false entry in the minute book of a corporation with intent to defraud. See also People v. Phelps, 49 How. Pr. 462.

But the defendant insists that even though the draft in question made by Angus Bell was a forged instrument within the purview of § 9895, supra, nevertheless the evidence does not establish that the defendant had knowledge that it was such a forged instrument or that when she cashed it she intended thereby to defraud the bank or anyone else. Mrs. Bell's testimony is that the draft was given to her by her husband; that she knew he had authority to sign such instruments; that she took it in good faith without knowledge that it was a forgery; that when she procured Hollar's signature and thereafter cashed the draft, she did so in good faith and at her husband's direction without any thought to defraud; that she turned the whole

proceeds thereof over to Bell. And there is no direct evidence to the contrary. But knowledge and intent may be established by circumstantial evidence. If Mrs. Bell's testimony were accepted by the jury as true, unquestionably there would be no case made against her. But the jury were not bound to believe what she said regarding these matters. And if they believed, as apparently they did, the testimony of Hollar with respect to the circumstances of the endorsing of the draft and the subsequent conversation about the matter and viewed this testimony in the light of all the circumstances, including the knowledge that Mrs. Bell possessed (as shown by her letter) concerning the irregularities of Bell in the drawing of drafts, there was sufficient evidence to warrant them in finding not only that she had the guilty knowledge, but also the fraudulent intent essential to the offense of forgery under section 9906.

There remains then the question as to whether the action of the state in inquiring of Mrs. Bell when on the witness stand as to whether she would consent to have her husband examined as a witness against her, and such reference as the state's attorney made in his argument to the fact that she had refused to give such consent, constituted reversible error. Considering the order denying defendant's motion for a new trial heretofore quoted, it is apparent that this question cannot now be raised. That portion of the order heretofore quoted shows that only two grounds were urged in support of the motion, and this was not one of them. Those grounds not urged on the motion for a new trial were waived and cannot be raised on this appeal. See State v. Glass, 29 N. D. 620, 151 N. W. 229, and cases cited; State v. Grams, 65 N. D. 400, 259 N. W. 86. But, in any event, the defendant's contentions in this regard could not be sustained on the record as made.

Section 7871, Comp. Laws 1913, as amended by chapter 189, Session Laws 1929, provides:

"A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; . . . ."

The defendant Mrs. Bell on the witness stand in her own behalf, testified as to the conversation with her husband at the time he gave her the draft. Her husband was in the court room when this testimony was given. When she was cross-examined by the state's attorney he inquired: "Now would you give your consent to Angus Bell coming up here into court and testifying to what the facts are?" Counsel for the defendant objected to this inquiry. There was some colloquy between the court and counsel and the court inquired: "Where is Mr. Bell?" The state's attorney answered: "He is in the court room." The court thereupon inquired: "Is that your husband?" Mrs. Bell answered: "Yes, sir." This colloquy took place in the presence of the jury. The defendant now argues that this whole proceeding was unwarranted and improper and could not but have prejudiced the jury against the defendant. She insists that the inquiry as to whether her husband might testify should have been made out of the presence of the jury and that the whole affair was staged in a spectacular manner and with the intent that it should have an effect adverse to the defendant.

It seems to us there is no ground for this contention. The record discloses no more than we have indicated above. Mrs. Bell had testified as to her conversation with her husband. She predicated her defense upon what he told her when he gave her the draft and her belief in what he then said. The state could not have anticipated that this testimony would be offered. As a matter of privilege, grounded on public policy, her husband could not be examined as a witness against her without her consent. This privilege was personal to her She might waive it. The inquiry as to whether she would give her consent had to be made of her at some time. We cannot see why her husband's testimony should be distinguished from any other relevant evidence subject to objection that might be offered. Besides, the state did not concede that her testimony was to be accepted as true. If her husband were present and not called, the natural inference would be that he would corroborate it. The jury were entitled to know why he was not called. The theory behind the privilege is that to permit either spouse to testify against the other without that other's consent, would tend to domestic disharmony. The privilege is a shield

and not a sword. It is not conferred to enable him who exercises it thereby to strengthen his case. So there was no impropriety on the part of the state in bringing up the matter as it was brought up, nor can we see how any prejudice resulted. There are cases holding that such an inquiry made in open court before a jury may be so prejudicial as to warrant a reversal. But it seems to us that reason, as well as the greater number of authorities is to the contrary. As showing the diversity of holding in this regard, see the following authorities and cases cited therein and in the Notes thereto. Pennsylvania R. Co. v. Durkee (C. C. A. 2d) 147 F. 99, 8 Ann. Cas. 790; State v. Roby, 128 Minn. 187, 150 N. W. 793, Ann. Cas. 1915D, 360; Hampton v. State, 7 Okla. Crim. Rep. 291, 123 P. 571, 40 L.R.A.(N.S.) 43; 4 Wigmore, Ev. 2d ed. §§ 2241, et seq.; 5 Jones, Ev. 2d ed. § 2132.

In the instant case the court ruled, properly, that since Mrs. Bell refused to consent thereto, her husband could not be examined as a witness against her. Thereafter and at the time of the argument of the state's case, counsel for the defendant made some reference to the fact that Mr. Bell had not testified. The record shows that during the course of his argument the state's attorney said: "Because you are not permitted to have the opportunity of hearing Mr. Bell's testimony." Counsel for the defendant then objected: "We object to any remarks made by counsel for the state on the failure of Mr. Bell to testify in his argument to the jury." The court then said: "Let the record show that the attorney for the state may make any reference he desires to with reference to the defendant, Mrs. Bell, refusing to permit her husband to testify in this case." And further said to counsel for the defendant: "That protects your record." The foregoing is all that we have before us. We can only conjecture as to what preceded the remark of the state's attorney to which the defendant took exception, and there is nothing to indicate that anything further was said by counsel for either side as the argument proceeded. The court's ruling was too broad. But as the matter stands we do not think it can be said that there was any prejudice to the defendant on account thereof. The burden is upon the defendant to establish prejudicial error. Mere conjecture is not enough to warrant a rever-

sal. The question turns not on what the state's attorney might have said but on what he did say. Erickson v. Wiper, 33 N. D. 193, 157 N. W. 592; State v. Eggl, 53 N. D. 520, 206 N. W. 784. The defendant in refusing to permit her husband to testify was exercising a privilege conferred by the statute, § 7871, supra. So the state had no right to urge that her refusal indicated guilt on her part or that any inference adverse to her could be drawn by the jury from the fact of that refusal. This court has heretofore held that "No unfavorable inference can be drawn against a party to an action for objecting to the testimony of a doctor, on the ground that such testimony is privileged, nor for the failure to call the doctor as a witness." Meyer v. Russell, 55 N. D. 546, 214 N. W. 857. And, logically, the same rule should and does apply in such a case as the one at bar. In any event, the trial court, consistent with this rule, in charging the jury, said: "Both attorneys have referred to the fact that the defendant did not consent to have her husband testify in this case. She had a legal right to not consent to it and if she did not want to consent to it, she did not have to under the laws of this state. The fact that he did not testify is not any evidence of any material allegation contained in the information. You must find the defendant guilty, if you do find her guilty, from the facts under these instructions, from the evidence in the case, and not from the fact that her husband did not testify." As we have stated above, the defendant predicated her defense upon the proposition that her husband had given her the draft in question, directed her to cash it and bring the money to him; that she believed he was acting within his authority in doing so, and that she innocently complied with his request and direction. The state was not bound by this testimony nor required to accept it as the truth. The defendant's husband was present in court. He also knew what the facts were. If he were not called the jury might well infer that the state conceded the facts to be as the defendant testified, or at least that her husband would testify to the same effect. So it was proper that the jury be informed why he was not examined with respect to the matter. And though the state's attorney could not properly argue that an inference adverse to the defendant might be drawn from the fact that she did not consent that he might testify, nevertheless, it

was proper for counsel to state why he had not done so. So far as appears on the record this was in effect all that was said.

The judgment and order are affirmed.

CHRISTIANSON, Ch. J., and BURKE, MORRIS and BURR, JJ., concur.