## W. A. MERRIOTT v. STATE.

No. A-3293—Opinion Filed Sept. 11, 1920.

Rehearing Denied Jan. 15, 1921.

(194 Pac. 263.)

1. **APPEAL AND ERROR—Review—Conviction on Conflicting Evidence.** In a criminal prosecution, questions of fact are for the trial jury to determine; and, where the evidence is conflicting, a verdict of conviction will not be disturbed upon the ground that it is contrary to the evidence.

2.    **APPEAL AND ERROR—Instructions—Necessity for Requests.** Where counsel for the defendant believe that the instructions of the court should more definitely or fully state any proposition embraced in the charge, it is the duty of counsel to prepare and present to the court a correct and complete instruction and request that it be given; and, in the absence of such request, this court will not consider an objection that an instruction, correct as far as it goes, does not fully state the law, or that the court failed to instruct upon any given proposition, where the instructions, considered as a whole, embody the law applicable to the case.

*Appeal from District Court, Carter County.*

W. A. Merriott was convicted of assault with intent to do bodily harm by shooting, and he appeals. Affirmed.

*Brown & Williams* and *J. H. Mathers,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *E. L. Fulton,* Asst. Atty. Gen., for the State.

DOYLE, P. J.    The information in this case charged that in Carter county, on or about the 12th day of April, 1917, W. A. Merriott did shoot one W. V. Parker with a shotgun with intent of him, the said Merriott, to kill the said Parker. On his trial the jury found him guilty of assault with intent to do bodily harm as charged in the information, and fixed his punishment at imprisonment in the penitentiary for a period of 3 years.

In order to present the questions raised as to the sufficiency of the evidence, and by exceptions reserved to instructions, we will briefly state the testimony in the case.

W. V. Parker testified:

"I am 56 years old. I have a cotton gin at Brock, and my sons have a store there. On the evening of the

date alleged I went to my sons' place of business. I then went to McCaskell's place. I then started up the street towards Carroll's store. I was 20 or 30 feet behind Wood Hammer when I saw Dr. Merriott coming from the back door of Carroll's store. He met Wood Hammer, and they both walked towards the doctor's buggy. I heard Wood Hammer say, 'Don't do that, Doctor.' I was about 15 feet from them, and Dr. Merriott pulled up a shotgun and fired and shot off those fingers (indicating). I walked back. I heard another shot sounded like a shotgun. I went into McCaskell's place, and asked him to bind up my arm. I was there 2 or 3 minutes. I heard three loud reports and five or six lighter reports. I had no weapon of any kind."

Wood Hammer testified:

"I am a farmer, and run a little mercantile business in Brock. I have lived in that community 22 years. I saw Dr. Merriott that afternoon; he was drinking. He asked me if I had been telling that he had been turning the boys' names in for the army. I told him I had not. About three-quarters of an hour from that time I saw him going out the south door of Carroll's store. It was dusky dark. I had started home. I says, 'Is that you, Doctor?' He said, 'Yes; what is it you want?' He walked out to where I was and then to his buggy. He picked up a double-barreled shotgun, and wheeled around and told me to stand back. I got hold of the gun before it was fired, and I said, 'Don't do that,' and he pulled it off. The first shot hit Mr. Parker. We scuffled back 10 or 12 feet, when the second shot was fired, and I turned the gun loose and went to the south side of the store, and then another big gun fired. Up to that time there was no small reports. I was unarmed. I never had a cross word with Dr. Merriott. He was drinking, and I grabbed the gun when he threw it up to shoot Mr. Parker, because I thought he might shoot me."

Carl E. Parker testified:

"W. V. Parker is my father. My business is general merchandise at Brock. I was in my store when the first shot was fired. I heard 6 or 7 shots. The first two were the loudest. I saw Dr. Merriott that evening at the blacksmith shop; he was staggering, and the way he talked I thought he was drunk."

Bonnie Clayton testified:

"I am a blacksmith. My shop is the first door south of Carroll's store, about 30 feet south. Dr. Merriott came in my shop about sundown. He acted like he was drinking. He talked thick-tongued and staggered as he went to the back of the shop. Within an hour I heard the shots fired. I was sitting in my home holding the baby. The first shots were louder than the others."

C. W. Clayton testified:

"I live a block from where this shooting occurred. I was laying down dozing when I heard the first shot. I jumped up and ran to the door just as the second big shot fired, and then the third big shot fired. Then I heard three or four other reports."

Charles Parker testified:

"I am a teacher. I was in my brother's store when I heard the first shot. I stepped out on the veranda and off into the street, and I heard that my father was shot. I ran into the store and got a pistol and went up the street. When near the corner of the blacksmith shop I saw some parties scuffling and the second shot fired. Then Wood Hammer ran south of Carroll's store, and Dr. Merriott ran to the north side, and turned around and fired at me with a shotgun; I returned the fire. He fired 1 shot at me, and I fired 3 at him. I had six cartridges in my gun."

Several witnesses testified to meeting Dr. Merriott that evening, and that he appeared to be drunk.

For the defense Lee H. Copeland testified:

"With Dr. Merriott, Whit Carroll, Zack Barker, and Bill Flowers, I went to Ardmore that day in a car to see about a lawsuit concerning the school at Brock that Charles Parker, a son of old man Parker, was teaching. We left Ardmore about 4 or 5 o'clock, and I got out of the car about a mile from Brock. Mr. Barker and Mr. Flowers got out at the same place. Dr. Merriott was sober when I left him."

Two or three other members of the party testified in substance the same.

Dr. R. H. Henry testified:

"I am a practicing physician at Ardmore. I assisted Dr. Hardy and Dr. Gregory in dressing the wounds that were inflicted on Dr. Merriott on the 12th day of April this year. He was shot a little above the superspinal process, and the bullet came out in front to the right of the navel, and another passed through the muscle of the leg."

John Hughes testified:

"Dr. Merriott occupies the first residence north of Carroll's store, about 40 steps from where I live. I was at McCaskell's place when the shooting occurred. It was about 8:30. There were 2 small shots, then a loud one. I followed Loren Hammer out into the street. We went in between the buildings. They kept on shooting. There were 10 or 12 shots fired. After the shooting we started up the street, and met old man Parker. He said, 'Boys, I am shot; get a light.' It is about 70 steps from Parker's store to Carroll's store. McCaskell's place is 5 or 6 steps from Parker's store. Parker's son came walking down and said, 'What is the matter, papa?' and the old man said, 'He shot my hand off'."

D. A. McCaskell testified:

"I was running a restaurant at Brock. W. V. Parker, his son Charley Parker, and Wood Hammer were in my place after dark. Charley Parker said, 'I believe I will go home,' and walked out. Wood Hammer and old man Parker followed about 2 or 3 minutes later. Two or 3 minutes later the shooting commenced. Carroll's store is 50 or 60 steps from my place. The first 2 shots I heard were small guns; I started to the door, and the big gun fired; I walked to the gallery, and there was continuous shooting. I thought it was an automobile. I started up there, and met old man Parker. He said he was shot. I said, 'Who shot you?' He said, 'Dr. Merriott.' I wrapped up his hand the best I could, and he started home."

Whit Ironheart testified:

"My age is 16 years; I am a grandson of Whit Carroll. I held Dr. Merriott's horses while he and Graham Carroll went into the store. It was mighty dark. I saw old man Parker and Whit Hammer stop between the store and the blacksmith shop about a half minute. Then Dr. Merriott came out the back door of the store. Hammer asked him where he was going, and Doctor told him he was going to Beardon's; that his boy had been kicked in the head by a mule. Doctor came to the buggy, and I turned the horses loose. I heard a gun fire, then another gun fired, and as I got in the door another gun fired. It stopped a while, and then they commenced shooting sure enough. I could not tell who fired the first shot. I could not say whether Dr. Merriott had anything in his buggy or not."

Graham Carroll testified:

"My father has a grocery store at Brock, and handles a few drugs. I was clerk, and Dr. Merriott had his medicines there. I had occasion to come to the store that evening to let Dr. Merriott in to get some drugs. Dr. Merriott came in a buggy, and stopped the horses

in front of the store. He told Whit Ironheart to hold them by the bits. It was just getting dark. We were in the store between 5 and 10 minutes. I saw Wood Hammer looking in the window. When Dr. Merriott went out, Wood Hammer and Mr. Parker were standing out there. Wood Hammer said, 'Where are you going, Doctor?' and I saw Wood Hammer follow him; then I heard the shooting. I heard 15 or 20 shots."

As a witness in his own behalf the defendant testified:

"I have lived at Brock since last November, practicing medicine. I went to Ardmore that day in Mr. Carrol's Ford car with other parties. It was late in the evening when I returned. I went to this blacksmith shop; stayed there 2 or 3 minutes; went back to the store where my office was, and had a phone call from Will Beardon that his boy had been kicked by a mule. I hitched up the team and went to the office; got some bandages, and got a double-barreled shotgun and put it in the buggy. It was loaded with No. 6 shot. I drove to the store; told Whit Ironheart to hold the ponies while I went into the store with Graham Carroll. I don't suppose I was in the store over 3 minutes. I heard footsteps on the porch while I was in there, and saw Wood Hammer peep in the window. I went out the side door, and Wood Hammer was standing there. He said, 'Is that you, Doctor?' I said, 'Yes.' He said, 'Where are you going?' I told him I was in a hurry, and he followed me. As I went to get in my buggy there was a shot fired from behind. I was shot in the side here. I got the gun out, and Wood Hammer grabbed hold of it. I saw old man Parker with a six-shooter in his right hand, advancing with his other hand extended. The gun discharged. That was the last I seen of Parker. I did not shoot old man Parker. Wood Hammer had hold of the gun when it went off. That was the only shot fired out of my gun. I jerked it loose from Wood Hammer, and Charles Parker came out from behind the

north side of Carroll's store and opened fire on me. Before I ran, my gun snapped twice. As I went home I was shot in the thigh. It was a flesh wound. To the best of my knowledge there were about 18 shots fired at me. I was confined four days in Dr. Hardy's Sanatorium. After that I dressed the wounds myself. I had been warned that these parties were going to get me. I had not been drinking, and I was not .drunk. I had lived at Hoxbar in this county, and had trouble there. They had a. charge of larceny against me, and when the trial came off the counsel I.had employed fell down on me, and the judge put me to trial without counsel or witnesses. I got sent to McAlester, I stayed there about 14 months, and the Governor paroled me."

It is obvious that the case was one for the jury. It was for the jury to judge of the weight of the evidence. and the credibility of the witnesses. This court has uniformly held that when the inference of guilt can be reasonably drawn from the evidence it will not interfere with the verdict on the ground of want of evidence to support it.

The court of its own motion gave 13 instructions, and in addition thereto gave the only instruction requested by the defendant. The instructions given properly define the crime of assault by shooting another with intent to kill, and the included offense of assault by shooting another with intent to injure, although without intent to kill. The court instructed the jury upon the presumption of innocence, and that:

"It is incumbent upon the state to prove every material fact necessary to the conviction of the defendant beyond a reasonable doubt."

Among other instructions given are the following: .

"The defendant in this cause, in support of his plea

of not guilty, interposes what is known in law as the plea of self-defense, that is, if he did shoot and wound the said W. V. Parker he did so in the defense of his own person and to prevent the said W. V. Parker and others from assaulting him with pistols. The defendant does not admit that he fired the shot that wounded the said Parker, but he does admit that he took the gun from his buggy for the purpose of protecting himself against the unlawful assault made upon him by the said Parker and others, and that when he grabbed his gun for such purpose of his own defense the witness Wood Hammer grabbed the gun while it was in the hands of the defendant, and that while in a struggle between himself and the witness Wood Hammer for the possession of the gun it was discharged, and wounded the said Parker, that if he, the defendant did fire the shot and wound the said Parker, that it was done in the resistance of an unlawful attack made upon himself by the said Parker and others. In this connection you are instructed that self-defense against unlawful personal violence or threatened personal violence is the right of every person when unlawfully assaulted by another, and such person when so unlawfully assaulted has the right to resist such assault with such force as may be necessary to repel it. (Excepted to by defendant and exception allowed. W. F. Freeman, Judge.)

"If you believe from the evidence beyond a reasonable doubt that the defendant, in the county and state aforesaid, and at the time aforesaid, did unlawfully make an assault upon the said W. V. Parker by shooting and wounding him without justifiable or excusable cause therefor, but you should entertain a reasonable doubt that said shooting was done with intent to kill, and you should believe beyond a reasonable doubt that said shooting was done without justifiable or excusable cause, and was done with the intent to injure the said Parker, that said shooting was done with the intent to do bodily harm to the said Parker, then in such case you should find the defendant guilty of an assault to do bodily harm, and assess his

punishment at confinement in the state prison for a term not to exceed 5 years, or by imprisonment in the county jail not to exceed one year. (Excepted to by defendant and exception allowed. W. F. Freeman, Judge.)

"You are told that, even though you should find that the defendant did shoot and wound the said Parker with a gun in the manner and form, and at the time and place alleged in the information filed herein, but that when such shooting and wounding was done on the part of the defendant that said witness W. V. Parker and others, or any of them, were assaulting him with pistols or other deadly weapons, or were attempting to so assault him, then in that case such wounding and shooting on the part of the defendant would be justifiable under the laws of this state, and if you so find from the evidence and circumstances of this case, you will find the defendant not guilty, and so say by your verdict."

It is contended:

"That the court did not instruct the jury, on the law applicable to the theory of the defense, and that the court cast the burden of proving his innocence upon the defendant."

We do not think that there is any merit in this connection. The instructions as a whole embody the law as applicable to the case, and they contain no such erroneous statement of the law as was likely to mislead the jury. Where counsel for a defendant believe that the instructions of the court should more definitely or fully state any proposition embraced in the charge, it is the duty of counsel to prepare and present to the court a correct and complete instruction, and request that it be given, and in the absence of such request this court will not consider an objection that an instruction, correct as far as it goes, does not fully state the law or that

the court failed to instruct upon any given proposition, where the instructions, considered as a whole, embody the law applicable to the case.

Upon consideration of the whole case the court is satisfied that the substantial rights of the defendant have not been prejudiced by reason of any error of law appearing in the record. The judgment of the district court of Carter county is therefore affirmed.

ARMSTRONG and MATSON, JJ., concur.