## LEE BALDOCK v. STATE.

No. A-8927.    Nov. 1, 1935.
(50 Pac. [2d] 1131.)

A. Wayne Billings and M. H. Gordon, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J.    Plaintiff in error, Lee Baldock, herein referred to as the defendant, was convicted of manslaugh-

ter in the first degree on an information filed in the district court of Woodward county, August 6, 1934; wherein it was charged that the said Lee Baldock in said county, on the 31st day of July, 1934, did kill and murder one Roy Nettles, by shooting him with a pistol.

In accordance with the verdict returned by the jury, the court, on December 12, 1934, rendered judgment and sentenced the defendant to imprisonment in the penitentiary for a term of 35 years. From the judgment, the defendant appeals.

In order to present the questions raised as to the sufficiency of the evidence, and by exceptions taken to the instructions, we will briefly state the facts, also excerpts, from the testimony of the witnesses.

It appears from the evidence that Roy Nettles and his wife lived at the home of his mother-in-law, a two-room house facing east at Twelfth and Jackson, in the city of Woodward. The defendant lived at Henryetta, but had been visiting his uncles Jim and Bud Slaughter in Woodward, for about a month.

That in the forenoon of the 31st day of July, 1934, the defendant and two or three others were at the home of the deceased drinking beer, and in the afternoon of that day these parties returned to the home of the deceased and Jimmie Heekin and Bob Hamilton had a scuffle or fight in the house. About 3 o'clock all the parties left the place. The deceased with Jimmie Heekin returned to his home that afternoon about half past five. The deceased was lying on a bed in the front room and Jimmie Heekin was sitting on a trunk when the defendant Baldock entered the front door and shot Roy Nettles three or four times with a Smith & Wesson pistol.

Jimmie Heekin testified that Lee Baldock came in and said to Roy, "You think you are a tough son-of-a-bitch, don't you," and Roy said, "No, I don't pretend to be." Baldock said, "Well, we had just as well get this trouble over with," and commenced to shoot. That each time Nettles raised up on the bed the defendant shot him; winess said, "Man, don't kill him," and the defendant turned and struck witness over the head with the gun and left, with Jim Slaughter and William Croy, who were standing in the door when the defendant fired the shots. Roy said, "Take me to the hospital," and he helped him up and out into the car and took him to the Woodward Hospital. He further testified that he saw a pistol under the bed there that morning and when he returned from the hospital with the sheriff he found the pistol in the same place he had seen it that morning.

Doctor C. R. Silverthorne testified that Roy Nettles was received at the hospital at 5:50 p. m., that he found four gunshot wounds in the region of the heart and lungs, causing internal hemorrhage resulting in death within three hours. That the patient asked his opinion and he told him he could not recover, and knowing he was about to die made a statement saying:

"A man came in the house, walked up to the bed and said something like, 'You are a tough guy,' and he said, 'I don't know as I am,' and he said, 'We had just as well settle this right here, hadn't we?' and he said, 'I guess we had,' and as he started to get up off the bed the other party began shooting. The deceased said that his gun was lying under the bed."

William Blevins, sheriff, testified that he was called to the hospital and found the doctors examining Roy Nettles; from there with Jimmie Heekin he went to the Hamilton house and from there to Jim Slaughter's house;

there Bob Hamilton got in the car and said the defendant was down at the Katie roundhouse; he found him there, arrested him, searched him, and found about a pint of whisky on him, and then placed him in jail. That the gun Jimmie Heekin brought from the Hamilton home was an automatic .32, that it was loaded, 7 shells in the magazine and one in the barrel, and he could not observe evidence of any burnt powder.

At the close of the state's evidence in chief, the defendant asked the court to advise the jury to return a verdict of not guilty, on the ground that the evidence does not warrant a conviction.

The defendant, as a witness in his own behalf, testified that he lived at Henryetta, but had been visiting his two uncles, Jim and Bud Slaughter, for about a month. That he had been drinking beer in the forenoon at Roy Nettles' home with Blackie Heekin and Bob Hamilton, and that afternoon he was drinking beer there again with them, and Kenneth McCutcheon came in; then Roy Nettles came in with an automatic pistol in his belt. Bob Hamilton and Blackie Heekin were fighting, and when Bob hollered, "Enough," Roy Nettles pulled his pistol out and said, "Go ahead and kick his head off"; then Kenneth McCutcheon and Roy Nettles went out the back door. "McCutcheon came back and told us we had better leave, that Roy Nettles was coming in and would kill us all, and they all left the place." About two hours later Bob Hamilton came to Jim Slaughter's drunk and had a .38 revolver; that he took the gun from Hamilton and said, "Bob you stay here and sleep and sober up," and Bob said, "Give me that gun and I will get some whisky," and he said, "No I want you to stay here tonight and straighten up and I will go and get you a drink some place." That he then went to the Hamil-

ton house; Roy Nettles was on the bed, and he said, "Roy I want to buy a pint of whisky," and Roy got the whisky, that he told him, "We have Bob over there to straighten him up and he will stay with me," and Roy said, "Damn you, are you going to straighten up this trouble, we will just settle it now," and grabbed his gun; that he does not know which fired the first shot; that Nettles dropped over on his face and Blackie Heekin reached over to pick up his gun and witness hit him on the head. That Jim Slaughter and William Croy came there shortly after the trouble; "that the reason he shot Roy Nettles was because he grabbed his gun to shoot me."

On cross-examination he admitted that he had been convicted at Kansas City, Mo., on the charge of larceny from the person.

William Croy testified that the defendant is his stepson; that he was at the Hamilton place when Bob Hamilton and the Heekin boy had a fight between 2 and 3 o'clock that afternoon. That they were all drinking. Later Bob Hamilton came to Jim Slaughter's. That when Lee Baldock left Jim Slaughter's house, Mrs. Slaughter said, "You had better go down there they may have some trouble," and with Jim Slaughter he followed him to the Hamilton house. That he was at the porch when the last shot was fired, stepped in and grabbed Lee and started dragging him off down the road, and before leaving saw the automatic lying between Nettles' feet, as he was crouched about half way up on the bed.

Jim Slaughter testified that William Croy and Lee Baldock were guests at his home in Woodward. That Bob Hamilton came to his place that afternoon and was carrying a gun and he talked him out of the gun and a little later gave it back to him. That Lee Baldock then talked

to him and finally got possession of the gun; that Hamilton was drunk and was demanding another drink; Baldock said he would get him one there, and Hamilton went into the house and Baldock started away; then he followed him, and Mr. Croy came out of the house and followed witness. That he had just stepped on the porch when the shooting took place and he saw Roy Nettles, Lee Baldock, and Blackie Heekin in the room. That he saw Lee Baldock standing with a gun in his hand and Roy Nettles standing beside the bed with a gun in his hand. They were probably three feet apart; that as he went in the shooting started, and Roy Nettles kind of settled down and the gun dropped from his hand. That the Heekin boy was sitting on a trunk and appeared to be drunk; that he reached over on the floor for something and Baldock turned around and hit at him.

Several witnesses testified that they had carefully examined the walls and ceiling of the room where the shooting occurred, but were unable to discover evidence of any shot on the part of the deceased or bullet marks of any kind.

The theory of the prosecution is that it was a deliberate, wanton murder; the theory of the defense was justifiable homicide in self-defense.

The first and second asignments of error are that the verdict is contrary to law and unsupported by the evidence. It is a sufficient answer to the contentions made to say that the testimony tended strongly to prove that the killing was premeditated and deliberate, and taking the testimony of the defendant, he is guilty of manslaughter in the first degree upon his own statement. We think the evidence was sufficient to support a verdict for the crime charged. Fortunately for the defendant, the jury, in mercy, or in a

mistaken view of the law, or the facts, found him guilty of manslaughter in the first degree. This the jury had a right to do.

The same question is raised in several assignments of error based upon exceptions taken to certain instructions given by the court.

And it is insisted that the court erred in failing to instruct the jury on the law of self-defense.

The court of its own motion gave seventeen instructions, and it appears that counsel for the defendant presented no request for instructions.

In the defendant's brief, it is said:

"There was no request made for an instruction on the issue of self-defense, but this court has held that it is the duty of the trial court, where there is any evidence of self-defense, to instruct the jury thereon, and that a failure to do so constitutes reversible error." Citing Collegenia v. State, 9 Okla. Cr. 425, 132 Pac. 375.

The distinction between the Collegenia Case and this case is that in the Collegenia Case no instruction whatever was given on the issue of self-defense.

The court gave the following instruction defining self-defense as applicable to the evidence, in the words of section 2237, O. S. 1931:

"VIII. You are instructed that homicide is justifiable when necessarily committed in the lawful defense of one's own person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there is imminent danger of such design being accomplished."

The court instructed the jury upon the presumption of innocence of the defendant, the doctrine of reasonable

doubt, and that his plea of not guilty placed upon the state the burden of proving the allegations of the information, and each and every material part thereof, to their satisfaction, beyond a reasonable doubt.

We do not think that there is any merit in the contentions made. The instructions as a whole embody the law as applicable to the case, and they contain no such erroneous statement of the law as was likely to mislead the jury. Where counsel for a defendant believe that the instructions of the court should more definitely or fully state any proposition embraced in the charge, it is the duty of counsel to prepare and present to the court a correct and complete instruction, and request that it be given, and in the absence of such request this court will not consider an objection that an instruction, correct as far as it goes, does not fully state the law, or that the court failed to instruct upon any given proposition, where the instructions, considered as a whole, embody the law applicable to the case. Merriott v. State, 18 Okla. Cr. 247, 194 Pac. 263; Fitzsimmons v. State, 14 Okla. Cr. 80, 166 Pac. 453; Dickson v. State, 26 Okla. Cr. 403, 224 Pac. 723.

The case appears to have been fairly tried, and submitted to the jury by instructions, not only free from reversible error, but free from reasonable criticism.

The judgment appealed from must therefore be, and it is, affirmed.

DAVENPORT, P. J., and EDWARDS, J., concur.