## A. O. ADAMS v. STATE.

No. A-9170.   July 16, 1937.
(70 Pac. 2d 821.)

Hickman & Ungerman, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen and Sam H. Lattimore, Asst. Attys. Gen., and Sim T. Carman, Co. Atty., for the State.

BAREFOOT, J. The defendant was charged with the crime of murder in Osage county. He was charged with killing George Gideon by stabbing him with a knife. The court, after hearing the evidence of the state, upon motion, reduced the charge to manslaughter, and the defendant was found guilty and his punishment fixed at four years in the penitentiary. From this judgment he has appealed.

Both the defendant and the deceased had been residents of the small town of Avant in Osage county for many years. The defendant had been a member of the school board, and the deceased and defendant had become embittered by reason of certain controversies growing out of the election of a certain school board member. On the day of the killing the deceased drove to the home of the defendant ostensibly for the purpose of selling a calf to him. He was accompanied by his small son, 12 years of age. On being informed that defendant was not at home, he drove to town and saw the defendant across the street and called to him. When the defendant came up to where deceased was, they had some words with reference to certain statements the defendant claimed deceased had made to another party. They finally agreed to leave together for the purpose of confronting the party who it was claimed heard the statements made by the deceased. They had not proceeded far when they came to a vacant lot and a fight ensued between them. The evidence was conflicting as to who started the fight or who hit the first blow. In the fight deceased was cut by the defendant with a pocket knife, inflicting a wound about five and a half or six inches long. The fight occurred on Friday, the 19th day of April, 1935, and the deceased died the following Monday from the effects of the wound inflicted by the defendant. The evidence showed that the

deceased, after going to see a doctor in the town of Avant, was taken in a car by two parties by the names of Harvey McCoy and Elwood Murray, to the town of Skiatook, eleven miles away, for the purpose of seeing a doctor and receiving medical attention. This trip was made on the same day of the fight but some time after it had occurred. The witness Harvey McCoy was called by the state on rebuttal and while upon the witness stand testified to certain conversations with the deceased during the time of the trip to Skiatook. This evidence was objected to by the defendant, and this presents the first and main error relied upon by the defendant for the reversal of this case. When this witness was placed on the stand, on rebuttal, he was asked certain questions about seeing defendant with a certain kind of knife a few days before the difficulty. This was for the purpose of rebutting the testimony of the defendant that the stabbing had been done with a certain knife. Upon taking the witness for cross-examination, counsel for defendant propounded to him the following questions:

"By Mr. Tillman: Q. Are you one of the boys that went to Tulsa with Mr. Gideon in the car? A. No, sir. Q. I ask you if you were one of the boys that went with him—I want to reframe the question and ask you if you are one of the boys that went with him to Skiatook? A. Yes, sir. Mr. Carman: Objected to as improper cross examination. The Court: Sustained. By Mr. Tillman: Q. I will ask you if, on the way to Skiatook, you had a conversation with Mr. Gideon in which he said this or this in substance: the son of a bitch cut me but when I get well it will be a different story? A. No, sir. Q. Well, did that conversation or a similar conversation take place at his bed where Gideon was in Skiatook, Oklahoma, at the time you were present? A. No, sir. Q. Huh? A. No. Mr. Tillman: That's all."

When these questions were asked and answered, the county attorney asked him the following questions:

"By Mr. Havens: Q. Mr. McCoy, state what George Gideon did say to you on the way down to Skiatook that day about this occurrence? A. Well— Mr. Tillman: Objected to as incompetent, irrelevant and immaterial and out of the presence of the defendant. The Court: Overruled. Mr. Tillman: Exception. A. You want to know what he said to Skiatook? By Mr. Havens: Q. Yes, sir. A. That is what you want to get? On the way to Barnsdall we asked him if he wanted to go to Skiatook or Barnsdall, and he said Skiatook, so we turned towards Skiatook and we asked him how come Bill to cut him with this knife, and he said he didn't know as he was going to until he had already cut him with the knife. Q. What else did he say? Just state the whole conversation that occurred on the way down to Skiatook. Mr. Tillman: The court understands that we make the same objection to the testimony as being incompetent, irrelevant and immaterial and not cross examination. The Court: Overruled. Mr. Tillman: And not part of the state's case and not rebuttal. The Court: It is not, but you inquired about a certain conversation. Mr. Tillman: One particular item and that is all. The Court: Well, they are entitled to bring it out. Mr. Tillman: To which we except. By Mr. Havens: Q. I will ask you this— Mr. Tillman: Wait a minute, the court said he could answer. The Court: Yes sir, what else was said was the question. A. Well, I don't know, we talked quite a bit, I asked him if he was hurt pretty bad and he said he thought he was, I asked him if he was bleeding pretty bad and he said he was, and Murray talked to him some, he was talking to him more than I did, I was driving the car. By Mr. Havens: Q. Did George Gideon say why he struck Bill Adams? Mr. Tillman: Objected to as incompetent, irrelevant and immaterial and he has asked the conversation. The Court: Overruled. Mr. Tillman: And it is leading and suggestive. A. Yes, sir, he said— Mr. Tillman: Exception. A. —why he struck Bill. By Mr.

Havens: Q. Just state what he told you why he struck Bill. Mr. Tillman: Objected to as incompetent, irrelevant and immaterial and self-serving. The Court: Overruled. Mr. Tillman: Exception. A. He said that the reason he struck Bill was to try to keep Bill from cutting him with the knife. By Mr. Havens: Q. Did he say anything about Bill coming out with the knife? A. Yes, sir. Mr. Tillman: We object to that as leading and suggestive. The Court: Sustained. By Mr. Havens: Q. Just state what he did say, then, with reference to that. A. Well, he said Bill come at him with the knife and struck at him and he said he tried to knock him back so he could not hit him with the knife and he said he could not hit hard enough. Mr. Havens: That's all. Mr. Tillman: That's all. And we move to strike all the testimony of the witness as incompetent, irrelevant and immaterial. The Court: Overruled. Mr. Tillman: And improper. The Court: Overruled. Mr. Tillman: Exception."

It is now earnestly contended by the defendant that the court erred in permitting the introduction of this testimony, and the state contends that the questions asked by counsel for the defendant as above set out opened the door, and, when these questions were asked, the state, on cross-examination, was entitled to prove the whole conversation, and the court did not err in admitting this testimony.

The general rule is that hearsay evidence is not admissible. There are certain exceptions to this general rule which are as well established as the rule itself. These exceptions are: (1) When the statements are made in the presence of a person and are not denied by him; (2) when they form a part of the res gestae; (3) when they constitute dying declarations; (4) when uttered as threats; (5) on cross-examination, the party has the right to have a witness give all of a conversation, when the opposite side attempts to bring out a part of that conversation.

There can be no question but that the testimony in the instant case does not come within the first four exceptions to the general hearsay rule. This is admitted by the brief filed by the Attorney General, but it is earnestly contended that it falls within the fifth exception. Let us analyze this question and see what is the correct solution. It is argued by the defendant that he does not deny the correctness of the exception stated, but he contends that this rule can only exist where a part or portion of the conversation is first brought out before the opposition can develop the whole conversation, and that in the instant case no part of the conversation was brought out by the witness on cross-examination, therefore, the state had no right to develop the conversation on redirect examination. This is a fine distinction, and a close question, but we believe that an examination and analysis of the questions asked by counsel for the defendant reveals that they were such that permitted the state to go into the matter and have the witness give the whole conversation. One of the questions asked the witness was:

"I will ask you if, on the way to Skiatook, you had a conversation with Mr. Gideon in which he said this or this in substance: 'The son of a bitch cut me, but when I get well it will be a different story.'"

The next question was:

"Well, did that conversation or a similar conversation take place at his bed where Gideon was in Skiatook, Okla., at the time you were present?"

While it is contended that by these questions being answered in the negative the witness gave no part of the conversation, yet counsel for defendant by the questions gave the answer himself. He sought to prove by the witness a conversation by the deceased, which, if the witness answered favorably, would be very much to his advantage.

These questions asked by defendant were inadmissible just as the questions asked by the state would have been inadmissible if they had been asked on direct examination, and, had this been done, there is no question but that the asking of them on direct examination would have been reversible error. But the defendant, having asked the questions as above indicated, and stating in the question what the conversation was, and giving the jury the benefit of that statement, cannot now complain that the state be permitted on redirect examination to have the witness give the full conversation. It would not be right to have the jury infer that the conversation took place as asked by counsel for the defendant and no opportunity given to explain what the real conversation was. Counsel for defendant opened the subject, and the state had the right to develop on cross-examination the entire conversation. Graham v. State, 28 Okla. Cr. 266, 230 Pac. 763; Valentine v. State, 16 Okla. Cr. 76, 194 Pac. 254; Gibbons v. Territory, 5 Okla. Cr. 212, 220, 115 Pac. 129, 130; United States v. Knowlton, 3 Dak. 58, 78, 13 N. W. 573, 575; Sager v. State, 11 Tex. App. 110.

We have examined the cases cited by defendant to support his contention, and are of the opinion that they are clearly distinguishable from the case at bar. The main case relied upon by defendant is Shepard v. United States, 290 U. S. 96, 54 S. Ct. 22, 23, 78 L. Ed. 196. In this case, deceased was the wife of defendant, and two days after she was taken to the hospital she asked the nurse about a certain bottle of whisky. When it was produced, she asked whether enough was left to make a test for the presence of poison, and then she stated, "Dr. Shepard has poisoned me." This evidence was offered by the government as a dying declaration and was permitted to be introduced upon that assumption. When the gov-

ernment saw it could not be introduced for this purpose, it was then contended that it was admissible because the defense had offered proof that the deceased had threatened suicide prior to her illness and death. The court properly held that the evidence was not admissible, basing as its main reasoning the fact that it had been introduced as a dying declaration and, having been received for that purpose, it could not be held admissible upon some other ground. It will thus be seen that the government offered this evidence as direct testimony. The defense did nothing to bring it out. As stated above, if in the instant case the state had introduced the evidence complained of as direct testimony, without any examination by the defendant, it would have been reversible error, and we should so hold, but such is not the case here. The other cases cited are distinguishable from the case at bar.

The next contention is that the court erred in giving certain instructions. These instructions were Nos. 5, 8, 12, and 13, which are as follows:

"No. 5. If you find from the evidence, facts and circumstances in proof beyond a reasonable doubt that in the county of Osage, state of Oklahoma, on or about the 19th day of April, 1935, the defendant A. O. Adams did unlawfully and in a cruel and unusual manner, or by means of a dangerous weapon, although without a premeditated design to effect the death of the deceased, and in heat of passion stab and wound the deceased, as a result of which wound the deceased came to his death, or if you should find from the evidence, facts and circumstances in proof beyond a reasonable doubt that said stabbing of the deceased was perpetrated unnecessarily by the defendant while resisting an attempt by the deceased to injure the defendant, or after such attempt had failed, then and under such circumstances it would be your duty to find the defendant guilty of manslaughter.

"Unless you should so find, it would be your duty to acquit the defendant.

"In this connection, you are further told that if you find from the evidence, facts and circumstances in proof that the deceased came to his death under such circumstances as to constitute excusable or justifiable homicide, then under such circumstances it would be your duty to acquit the defendant."

"No. 8. In determining the question of whether or not the defendant was in danger or apparent danger at the time of the homicide, the law requires you to view the circumstances at the time from the defendant's standpoint, as they reasonably appeared to him, and to determine whether the circumstances under which the killing took place, as they appeared to him, were sufficient to have excited the fear of a reasonable person that his life was in danger, or that he was in danger of receiving great bodily injury, or apparently so, and whether or not he really acted under the influence of such fear at the time.

"You are further instructed that no man can take advantage of his own fault and plead as a defense for taking human life a necessity which arose from his own intentional wrongdoing; and where a person seeks or provokes a difficulty with the deceased in order that he may have a pretext for killing or inflicting serious bodily injury upon him, and in such conflict does kill the deceased, the defendant is guilty of manslaughter, it matters not how hard-pressed he may have been in the conflict, unless after such provocation has been given or difficulty sought or provoked, and before the fatal blow is struck, the defendant in good faith abandons such intention and seeks to withdraw from the encounter."

"No. 12. You are instructed that if you find from the evidence, facts and circumstances in proof that the defendant herein voluntarily engaged in combat with the deceased, with a view of inflicting corporal punishment to the deceased, then and under such circumstances the

defendant could not avail himself of the law of self-defense, unless prior to striking the fatal blow the defendant sought in good faith to withdraw from said conflict and attempted to do so."

"No. 13. You are further told that even though you may find from the evidence, facts and circumstances in proof that the deceased struck the first blow upon the occasion of the encounter complained of, this fact alone would not justify the defendant in taking the life of the deceased unless he did so under an honest apprehension that his life was in danger or that he was in danger of receiving great bodily injury at the hands of his assailant and that the act complained of upon the part of the defendant was done in an effort to save himself from such injury."

Defendant complains that instruction No. 5 does not define manslaughter in the first degree as that offense is defined by the statute. While the instruction does not literally quote the statute, it does give each of the elements. It says "did unlawfully and in a cruel and unusual manner," or "by means of a dangerous weapon," and "in a heat of passion." These are the identical terms used in the statute defining manslaughter in the first degree. The last part of the instruction says: "that if said stabbing of the deceased was perpetrated unnecessarily by the defendant while resisting an attempt by the deceased to injure the defendant, or after such attempt has failed." The only difference in the language of the instruction and the statute is that the statute says, "while resisting an attempt by the person killed to commit a crime," and the instruction says, "while resisting an attempt by the deceased to injure the defendant." It occurs to us that the meaning expressed in the instruction is the same as expressed by the statute. Certainly under the circumstances in this case the jury knew that the instruction referred to an injury to the person of the

defendant at the very time of the difficulty, and did not have reference "to injury to his reputation by slanderous words spoken by the defendant," as suggested by the brief of defendant. The whole defense was based on the theory that deceased was making an assault with a dangerous weapon, to wit, a rock, upon the defendant, and that the defendant killed deceased in self-defense.

Defendant further complains of the final part of this instruction for the reason that the court does not use the term "reasonable doubt" by stating that, if the jury had a reasonable doubt that the defendant acted in self-defense in stabbing deceased, it would be their duty to acquit the defendant. The law of reasonable doubt was defined in other instructions and in this identical instruction is used at two different places. In the case of Edwards v. State, 24 Okla. Cr. 169, 216 Pac. 947, 948, the court says:

"Particular emphasis is placed on objections to the language used in instruction No. 17, because of an omission to use, at two or three places in the instruction, the words 'beyond a reasonable doubt.' The question of reasonable doubt was clearly treated and stressed in other instructions, and an instruction will not be held erroneous for a failure to repeat and reiterate, over and over again, the term 'beyond a reasonable doubt' when it appears that in that and other paragraphs of the instructions the court has made it clear to the jury that every issue of fact raised must be proved beyond a reasonable doubt. Davis v. State, 16 Okla. Cr. 377, 182 Pac. 909; Seigler v. State, 11 Okla. Cr. 131, 145 Pac. 308; Nutt v. State, 8 Okla. Cr. 266, 128 Pac. [165] 168; Spencer v. State, 5 Okla. Cr. 7, 113 Pac. 224; Cole v. State, 18 Okla. Cr. 430, 195 Pac. 901."

In the case of Cole v. State, the last case cited above, the court says:

"The principle of reasonable doubt at this late day is so firmly intrenched in the criminal jurisprudence of this country, and is so well known by jurors generally, as certainly not to require constant repetition of the rule in every paragraph of the charge, especially where the issues are not involved and no affirmative defense is interposed."

And in the case of Dodson v. State, 33 Okla. Cr. 85, 242 Pac. 578, 579, the court says:

"This court has firmly adhered to the principle that the burden of proof on the whole case is on the state, and that, if there exists any reasonable doubt as to any essential element of the crime charged, the defendant should be acquitted. On the other hand, this court will not indulge in abstruse shades of meaning in the consideration of particular clauses of an instruction, where, from a reading of the whole instruction, it appears that the jury could not have been misled. Jurors are not prone to consider hidden, obscure phases of qualifying clauses."

The law with reference to justifiable homicide was presented fully in instruction No. 6, and the defendant took no exception to the same. In instruction No. 7, the court instructed the jury as to the law of self-defense. The defendant reserved no exception to this instruction. But the defendant does contend with reference to instruction No. 8, which also relates to self-defense, that the court erred in advising the jury to determine whether the circumstances under which the killing took place, as they appeared to the defendant, were sufficient to have excited the fear of a reasonable person; the defendant contending that the jury should have been instructed that it should view the matter from the standpoint of the defendant as it appeared to him. This court, in following the rule adopted by a great majority of the states, has held otherwise. In the case of Jamison v. State, 35 Okla. Cr. 302, 250 Pac. 548, 550, the court, quoting from 30 C. J. pp. 30, 31, § 176, states the rule as follows:

" "* * * A reasonable conclusion under the circumstances that accused was in immediate danger of death or great bodily harm, although in fact no such danger existed, will be sufficient to eliminate the elements of malice and felonious intent, the appearance and not the reality of danger being the test, although defendant must have entertained an honest belief that he was in such danger; his act must be necessary or honestly believed by him to be necessary to prevent the injury, and the circumstances must have been such as to excite the fear of a reasonable man. * * *' "

And in 13 R. C. L. p. 818, § 122, it is said:

"The rule adopted by a number of the states, and what seems to have been the common-law rule, is that when a person is assaulted, and kills his assailant in self-defense, the question to be determined is, Did the slayer, under all the circumstances as they appeared to him, honestly believe that he was in imminent danger of losing his life, or of suffering great bodily harm, and that it was necessary to do what he did in order to save himself from such apparent threatened danger? and not, Would a reasonable man, or a man of reasonable courage, have so believed? The jurors, say the courts giving support to this rule, must place themselves in the position of the defendant at the time of the act, and determine, from all the facts as they appeared to him, whether his apprehension or fear of death or serious bodily injury was reasonable. What appears to be the prevailing rule in America asserts that the apprehension of danger and belief of necessity which will justify killing in self-defense must be a reasonable apprehension and belief, such as a reasonable man would, under the circumstances, have entertained. Under this rule, a man threatened with death must determine from appearances and the actual state of things surrounding him, as to the necessity of resorting to self-defense; and, if he acts from reasonable and honest convictions, he will not be responsible criminally for a mistake as to the extent of the actual

danger where other judicious men would have been, alike, mistaken."

The court also announces in this case that this rule is not contrary to the holding of the court in Rogers v. State, 8 Okla. Cr. 226, 127 Pac. 365, cited by defendant in his brief in this case.

The defendant also contends that the second paragraph of instruction No. 8 is erroneous. There is one error in this instruction as the court informed the jury that, if the defendant provoked the difficulty in order to have a pretext for killing the deceased, the crime would be manslaughter. It would, under such circumstances, have been murder. However, the defendant does not complain of this error, as the same would be to his advantage, but he does complain by saying that there was no evidence to justify this instruction, and that the court should have distinguished, for the benefit of the jury, "legal" and "illegal" acts of provocation, because, as he contends, it is not the law that any act of provocation deprives one of the right of self-defense. We think that a sufficient answer to the second proposition is that, if the defendant desired that the jury be informed as suggested in this contention, it was his duty, under numerous holdings of this court, to have prepared and requested such an instruction. Lumpkin v. State, 5 Okla. Cr. 488, 115 Pac. 478; Merriott v. State, 18 Okla. Cr. 247, 194 Pac. 263. The defendant cites the cases of Gibbons v. Territory, 5 Okla. Cr. 212, 115 Pac. 129, and Turnbull v. State, 8 Okla. Cr. 459, 128 Pac. 743, to support his contention. The instruction in the Gibbons and Turnbull Cases were specific instructions involving the facts in those identical cases.

In the case at bar the evidence showed that there had been ill feeling between the defendant and deceased some

time prior to the difficulty. The state contended that the defendant was the aggressor, and the defendant that the deceased was. Each contends that the other struck the first blow. Under this contention we are of the opinion that the latter part of instruction No. 8, taking into consideration the facts in this case, was proper. This court, in the case of Wilkie v. State, 33 Okla. Cr. 225, 242 Pac. 1057, 1059, in discussing the rule announced in the Gibbons Case, and upon which the Turnbull Case is predicated, says:

"The instruction under consideration in the Gibbons Case was a concrete instruction, applying the law to the facts in that case. Here instruction No. 8 is an abstract statement of the law. Analyzed, it simply advises the jury that the right of self-defense is for protection and not for aggression, and that an aggressor or a voluntary combatant, armed with a deadly weapon, cannot invoke the right of self-defense. That is undoubtedly a correct abstract statement of law. It was approved in case of McDaniel v. State, 8 Okla. Cr. 209, 127 Pac. 358."

And:

"The law dealing with the imperfect right of self-defense was not suggested at the trial, and not attempted to be given by the court. It was the theory of the defendant, not that he provoked the difficulty and then in good faith withdrew, but that deceased provoked the difficulty and was slain by the defendant upon appearance of danger in his necessary self-defense. The holding in the Gibbons Case cannot be extended to apply to the facts disclosed by the record in this case, and the law of self-defense set out in the instructions. It requires too great a refinement of interpretation to say that the instructions as a whole deprived the defendant of his right of self-defense. Whatever error there may be in the instructions, we think, is harmless. Little v. State, 25 Okla. Cr. 190, 219 Pac. 424."

The objections to instructions Nos. 12, 13, and 14 have been answered in the analysis of exceptions to the other instructions. We have carefully read and re-read the instructions and find that, taken as a whole, they fairly state the law as applied in this case. The defendant having had a fair and impartial trial, the judgment of the district court of Osage county is affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.