LANE et al. v. STATE.

No. A-11129.    March 22, 1950.

(216 P. 2d 353.)

108

F. H. Reily, Joe H. Reily, and J. W. Spurr, Shawnee, and J. V. Whitley, Duncan, Paul Donald and J. M. Donald, Bowie, Texas, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J.   The defendants, Ben Lane and D. A. Thomason, were charged by information in the district court of Stephens county, Okla., with the crime of grand larceny, wherein it was alleged that they stole from W. F. Turner 18 9″ rock bits of the value of $75 each, on August 7, 1947.   They were tried by a jury, convicted and their punishment fixed at one year in the State Penitentiary, and judgment and sentence was pronounced accordingly.

The proof offered in support of the information by the state was to the effect that W. F. Turner, an oil well drilling contractor, was drilling oil wells for the Carter Oil Company on the Revere ranch in Stephens county, Okla., on the date herein in question.   It appears that he had been losing drill bits by theft, and he had decided to catch the person or persons stealing them.   One of these drilling rigs was in the process of being torn down

on August 7, 1947. On the afternoon preceding the alleged larceny herein involved Mr. Turner observed the defendants about the rig and took their tag number. Just before dark Mr. Turner testified the defendants drove in where the drilling rig was being torn down and he observed them put the 18 rock bits in the back end of their black Mercury car. He thereupon went to the scene of the theft and inquired what they were doing. One of the defendants said "your men said we could have these bits". He informed them that they were mistaken. He told them to stay there and unload the bits, and that if Pete told them they could have the bits it would be all right. After they had unloaded the bits they started down the hill. While they were unloading the bits, Turner returned to his house and obtained his pistol. Approaching them as they started to leave he made them back up at the point of his pistol to the rig, and awaited the arrival of the sheriff. He said these bits were what he called green bits, that they were still good for use in soft formations, and that they had a value of $60 each. On cross-examination, he said during the war that the Hughes Tool Company had let them re-tip some of those bits because steel was hard to get but that this work was done by his own organization. He said the bits were his until he turned them back to the Hughes Tool Company. He identified the defendants Lane and Thomason as being the men he apprehended on the evening in question.

Mrs. W. F. Turner and Mrs. Fitts testified they got in the automobile, accompanied Mr. Turner to the rig and were present when they ran into the defendants headed away from the well, and Mr. Turner forced them to back up to the slush pit. They identified the defendants as being the same two men. They said, in about 45 minutes Mr. Ledbetter, the tool pusher for Mr. Turner, arrived

with the sheriff and another officer. The sheriff searched the defendants and placed them under arrest. Mrs. Turner stated that she saw the bits sitting there by the defendants' car. Mrs. Fitts said, when Mr. Turner came into the house, they saw there was something wrong, and Mr. Turner got his gun and they accompanied him to the well. She gave other testimony hereinafter considered which is assigned as grounds for reversal by way of erroneous remarks by the court in relation thereto.

Pete Ledbetter testified for the state that he was the tool pusher for W. F. Turner; on the occasion of August 7, 1947, they were tearing down one rig and the rig builders had quit work about 5 o'clock, and had gone away to eat with the expectation of returning. When he returned to the location Mr. Turner's car was sitting east of the pipe rack. He said he observed a Mercury coupe in front of Mr. Turner's car. Mr. Turner told him to go call the sheriff and he left immediately and did so. Some time thereafter the sheriff arrived and placed the men under arrest. He testified further that Mr. Turner had been losing some bits and that they had been on the lookout for the thieves. He said at no time did he ever tell any one that they could come and get any bits. He says that when the Hughes bits ceased to be usable they put them in a pile and the Hughes man would come and pick them up. Ledbetter identified the bits involved in the instant case as green bits which could be re-run. He placed the value of them at somewhere between $50 and $60 a piece.

Jess Gandy said that he saw the defendants on the day in question after he had returned from eating. Mr. Turner had the defendant's car parked by the drill pipe. Mrs. Turner and Mrs. Fitts were with him. He said he saw the bits stacked on the well floor. There were

18 of them. They were all Hughes 9″ bits, that they were good for further use and what drillers called "green" bits.

Bob Cates, sheriff, testified for the state that he arrested Lane and Thomason who were driving a black Mercury coupe, with a Texas license B-2020; that defendant Lane claimed ownership of the Mercury car.

The evidence on behalf of the defendants was in substance as follows: Ben Lane testified that he lived in Gainsville, Texas, that he came to Duncan, Okla., on August 7, 1947, looking for work. In a pool hall in Duncan he met a man by the name of Newman who said he was looking after a rig which he was fixing to move and that he had some bits out there that he wanted sharpened, and told him to go out there and pick them up. Lane testified Newman said he would have his driller meet him whenever he came back, that that was what he was to start doing. On this trip he said he was accompanied by defendant Thomason who lived in Bowie, Texas. He asked Thomason to ride up to Duncan with him. He said they made two trips out to the Revere lease. On the first trip the men were too busy working around the rig and they could not get in to get the bits. He said this man (probably referring to Newman) told them that as they cleared out "you can bring in a few of those bits. * * * I will meet you here and introduce you to your driller and he would tell you where to go". Later at about 5 or 5:30 they drove back up to the pipe rack. All of them who were working on the rig were gone, no one was there. There were some bits around the well, and Lane said to Thomason he "wondered if there was any particular ones he wanted". Thomason said "I don't know". Then said, "looks like they would have a watchman out here". About that time a man drove up in his Ford car and wanted to know "what our business was".

Lane said he informed him that he was sent there to get a few bits to have re-sharpened to start another hole. The man denied this was true and told them that they were just on a bad catch and told them to "stay right here" until he got back. He was gone 15 or 20 minutes, and they started driving up to this man's house, and they ran into Mr. Turner and he wanted to know where they had started. Lane said "let's go back to the fellow" (meaning the fellow that had told them to pick up the bits). Lane said there were two ladies with Mr. Turner. Turner forced them to back down to the point from which they came from the bit pile. Some time after dark the sheriff came and put them under arrest.

On cross-examination of the defendant Lane it developed that he had recently been running a welding shop in Wichita Falls, Texas. He said he had never been able to locate Newman since he saw him in the pool hall, and that he made no attempt to locate him. He admitted that on the first trip to the well location all of the men there were working and that he did not inquire of any of them about the bits because he said that they were rig builders and truck drivers and would not know anything about it. The second time he came down to pick up the bits nobody was there. He denied, however, that they loaded the bits into his car. Between the time he was arrested and the last time he had worked it had been about a week. He was asked if he had ever dealt in used bits before and he admitted that he had but denied he was dealing in them at the time of his arrest. The record discloses at the time of his arrest his automobile was searched and the officers discovered an account book in his car. Lane's attention was directed to this book and he admitted that it disclosed his dealings in used bits, "that is some of it". He recounted a number of

dates and amounts therein which involved transactions in relation to bits. The sums referred to ranged from as much as $350 down to as little as $70. He said, however, that the sums represented services rendered on bits and for welding services. The last transaction bore the date of July 28, 1947, 9 days before he was arrested. He testified the reason he quit the re-tipping business was because labor was so high and materials so scarce and the price so small that he was losing money and when he saw he could not make it he decided to go into some other business. With this predicate being laid his attention was called to a statement he made to the assistant county attorney on August 9, 1947, in which he said in relation to the book in question:

"Q. You had a book in which you had a record of sales. A. Yes, sir. Q. Sales from what? A. From various things. Q. There was some oil field equipment? A. Yes, sir. There was some of that in it all right".

Thus it appears that there was a conflict between his sworn testimony and the statement that he had made to the county attorney. He testified since his arrest he had done some welding and on the date of the trial on March 29, 1948, he was not in business at all. He said he had not had a chance to examine the bits in question.

D. A. Thomason, the other defendant, testified that he lived in Bowie, Texas, that he was employed as a rotary driller and had been so engaged since 1931. On August 7, 1947, he had occasion to come to Stephens county, Okla., with Ben Lane. He said that Ben Lane was coming over here to see a fellow and he just came over to drink a bottle or two of beer. When they got to Duncan he saw Lane talking to a man downtown. At about 5:30 they drove out to the well in question. There was no one there, but a big pile of bits was there. They were

at the back of the car where the bits were, Mr. Turner drove up, told them to remain there and then drove away. He said they decided to go up to the house and try to make a deal with him. They almost got to the house and then he made them stop. He denied that they had any intent to steal the bits, that he didn't know a thing in the world about them. He said he knew nothing unlawful about re-tipping bits, that his company often used re-tipped bits. The only reason he was involved was because he came along just on the trip with Ben.

On cross-examination of Thomason, it developed that he was in the pool hall and having one of his bottles of beer, and that was when Lane talked to a man he did not know and whom he had not seen since. He admitted that they were there at the well location prior to the time they were apprehended by Mr. Turner. At that time they just went up and looked around and went on. Lane told him they went to this rig to pick up some bits. He did not tell him what they were picking them up for, nor what he was going to do with them, that he helped pick them up and piled them up at the back of the car. They had packed them from the well floor to the back end of the car but did not put them in the car. He said they were all Hughes bits. He said at the time of this transaction he did not know that Lane had been in the bit business, that he had never been in his bit shop, and that he did not know whether he had been in the bit business since his arrest. He said he had known Ben Lane since about 1945. He had never made any attempt to locate the fellow that Lane said told him to get the bits.

The defendants offered in their behalf Jack Cohen, a dealer in junk and oil field supplies, who testified that a Hughes 9″ rock bit would weigh 60 to 65 pounds, and that he would pay for such used bits about a cent a pound

for scrap.  He did not testify that he had seen the bits in question or knew anything whatsoever of their value.

On rebuttal for the state, C. C. Wynn testified that he was district special sales representative of the Hughes Tool Company, that nobody other than the Hughes Tool Company reserved the right to re-tip such bits but they knew other persons were so doing; that he was familiar with the bits herein involved.  They were what was called "green" bits, and still had a value of $40 or $50 each in his opinion.

The foregoing constitutes the basis for the defendant's contentions.  First, it is alleged that the court erred in failing to instruct the jury upon the offense of petit larceny predicated upon the testimony solely and only of Jack Cohen to the effect that the 9″ rock bits would weigh 60 or 65 pounds each, and they were worth as junk about a cent a pound.  Defendants estimate that the total weight of the bits involved would be about 1,170 pounds, or that as junk the amount involved would be about $11.70.  Hence, they contend the trial court should have instructed the jury on their theory of petit larceny, even though they had not requested it so to do.  The witness Cohen at no time saw the bits herein involved or purported to testify relative to the value of the bits allegedly stolen by the defendants.  It therefore appears that there was no competent evidence upon which to predicate an instruction relative to petit larceny.  Witnesses on behalf of the state who had seen the bits testified they were of the value of from $40 to $60, and hence their combined value calculated upon the last figure of $40 would give them a value of not less than $720.  There being no competent evidence upon which to predicate an instruction as to petit larceny there was therefore no reason to support the giving of the same by the trial court.

The defendant did not request such an instruction. It was not error for the trial court to omit to instruct on every possible question presented by the defendants' theory of the case when he has failed to request such instructions. Carpenter v. State, 56 Okla. Cr. 76, 33 P. 2d 637.

Next, the defendants contend that the court erred in giving instruction No. 6, reading as follows, to wit:

"In this case there being two defendants, Ben Lane and D. A. Thomason, both on trial, you are instructed that you may find both of the defendants guilty or you may find both of the defendants not guilty or you may find either one of the defendants guilty and the other defendant not guilty as you shall deem proper under the law and evidence."

To the giving of the said instruction the defendants made no objection and reserved no exception. They now contend that the same is confusing. We have read the instruction. We do not find it confusing but find it to be plain and proper. In any event the defendants did not interpose an objection and save an exception to the instruction when given, which this court has repeatedly held must be done before it will consider the same on appeal, unless the instruction given is fundamentally erroneous. Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795. In Storer v. State, 84 Okla. Cr. 176, 180 P. 2d 202, 209, this court went further and said the giving of an instruction will not be considered in the absence of exception thereto, unless it is so fundamentally erroneous as to mislead jury and thus deprive defendant of his constitutional right to a fair and impartial trial. And further said:

"If counsel for the defendant had not been satisfied with this instruction and had thought that additional in-

struction on the question should have been given, it was his duty to call the matter to the attention of the court by requested instruction. Merriott v. State, 18 Okla. Cr. 247, 194 P. 263; Dickson v. State, 26 Okla. Cr. 403, 224 P. 723." Jarman v. State, 57 Okla. Cr. 226, 47 P. 2d 220.

See, also, Heatley v. Territory, 15 Okla. 72, 78 P. 79; Drury v. Territory, 9 Okla. 398, 60 P. 101; Glenny v. Territory, 15 Okla. 231, 79 P. 754. Such is the situation under this contention and the same is therefore without merit.

Further, the defendants contend that the court erred in admitting in evidence Exhibit A, the record kept by defendant Lane and found at the time of his arrest in Lane's automobile. The defendants contend that that was an attempt to prejudice Lane and make it appear that the book showed Lane had been dealing in stolen property. An examination of the record itself in no way reflected upon defendant Lane. To the contrary, it was in keeping with the theory of his defense that he was engaged at the time of his arrest in the legitimate business of picking up bits for the purpose of having them re-tipped. Whatever prejudice accrued to Lane was not by virtue of the introduction of the record of accounts into the evidence, but accrued through his confused and contradictory explanation of said items on cross-examination in relation thereto. It appears from the record he first admitted when confronted with the record that some transactions disclosed he had been dealing in used bits. Then he contradicted himself by saying that the very items he pointed out as being in relation to used bits were for services rendered on the bits for re-tipping the same. Then he was confronted by the statement that he made to the assistant county attorney on August 9, 1947, wherein he admitted that the book contained a record of sales of some

oil field equipment that "there was some of that in it all right" and "that was picked up as company operations, personal stuff". Then further on he contended that all of the items were for services rendered in re-tipping operations. The defendants' contention is based on the theory that the state offered said record book in an attempt to show the commission of other crimes. Certainly, it was not admissible for that purpose, and it was not so offered. It must be remembered that the witness took the stand in his own behalf and was being cross-examined by the state. The cross-examination was an attack upon his credibility. In this connection it has been repeatedly held by this court, as was said in Graham v. State, 28 Okla. Cr. 266, 230 P. 763, 767:

"The rule obtains in this jurisdiction that a defendant taking the witness stand and testifying in his own behalf, may be cross-examined the same as any other witness. He, like any other witness, may be asked questions pertaining to the matter at issue or that would go to his credibility as a witness. His cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. He may be asked questions irrelevant and collateral to the issue for the purpose of testing his memory, affecting his credibility and the weight of his testimony. In Castleberry v. State, 10 Okla. Cr. 504, 139 P. 132, it is said: 'The doctrine that a witness may be cross-examined as to matters going to credibility may well be regarded as an exception to the rule that cross-examination is to be confined to matters touched on in the examination in chief, and the limits within which either party may cross-examine upon matters not strictly relevant, but which affect the credibility of the witness, is largely within the discretion of the trial court, but the privilege of degrading a witness by proof of disreputable conduct, not connected with the facts on trial, is one so liable to abuse that it should be closely guarded and allowed only upon

the exercise of sound judicial discretion, and then only to affect the credibility of the witness.' "

To the same effect is Murphy v. State, 72 Okla. Cr. 1, 112 P. 2d 438. The cross-examination of the defendants in relation to the record account book taken from his car, and his explanation in relation thereto, was admissible in connection with the statement made to the county attorney, for the purpose of impeaching him on matters affecting his credibility. Davis v. State, 59 Okla. Cr. 26, 57 P. 2d 634. The witness' explanation thereof being confused, contradictory and filled with discrepancies the record book was an essential part of the cross-examination and was properly admitted in evidence. Without the defendant's confused and contradictory explanation of the record the same would have been in keeping with his theory of the defense herein imposed and highly beneficial to him. It is further contended, however, that the record account book was not admissible against the defendant Thomason, and that if admissible against Lane should have been limited by the trial court to him alone. This is undoubtedly the law in this regard. In Gonzalus v. State, 7 Okla. Cr. 444, 123 P. 705, it was said:

"Where two or more defendants are being jointly tried for the commission of an offense, and any evidence is introduced which tends to prove the guilt of one of the defendants, and which is admissible for that purpose, but would not be admissible against the others, if they were separately tried, it is the duty of the trial court to admonish the jury that they should limit their consideration of such evidence as tending to prove the guilt of the defendant against whom it was admitted, but that they should not consider it as testimony against the other defendants." Rogers v. State, 9 Okla. Cr. 277, 131 P. 941.

However, since this evidence was introduced for the purpose of impeaching Lane's credibility only, it could not have affected Thomason.

"Only those persons can be heard to complain of an error in the ruling of a trial court who have been injured thereby." Gonzalus v. State, supra.

Moreover, this contention comes too late since no objection was raised at the time of trial on this ground, nor was there a request that the court limit the purpose of the admission of this evidence to defendant Lane.

Further the defendants contend that the court erred in commenting upon the evidence to the prejudice of the defendants in relation to the evidence of Mrs. Fitts. She stated that she was visiting in the Turner home on August 7, 1947. The county attorney asked if that was the date the 18 bits were taken from the Revere lease and placed in the automobile and she answered "Yes". Then counsel for the defendant objected as calling for a conclusion of the witness and asked that the same be stricken from the record, to which the court replied "the question is improper unless she says they were stolen and put in the car". It is the defendants' contention that the court in so stating was assuming in the presence of the jury that the bits had been stolen and that the statement of the trial court was a direct statement that the defendants had stolen the bits and put them in the car which nullified all of their defense. We do not so interpret the court's remarks. But, in any event, the record discloses that no objection was interposed and no exception saved to the remarks of the court. The question is raised on appeal for the first time. In Bonner v. State, 23 Okla. Cr. 44, 212 P. 440, this court said:

"Only prejudicial errors raised by exceptions reserved, require a new trial, and it is only when we are satisfied that the verdict was contrary to law, or to the evidence, or that injustice has been done, that this court is permitted to reverse a conviction, whether or not an exception has been taken in the trial court."

Under the conditions herewith presented the objection comes too late to be available to the defendants.

Finally the defendants question the sufficiency of the evidence to sustain the conviction. While the evidence is highly conflicting, this court has repeatedly held that where there is any evidence reasonably tending to support the findings of the jury, this court will not disturb the same on appeal. As was said in Queen v. State, 35 Okla. Cr. 412, 250 P. 935:

"The credibility of the witnesses and the weight and value to be given their testimony is within the exclusive province of the jury to determine, and the jury may believe the evidence of a single witness upon a question of fact and disbelieve several others testifying to the contrary."

Such is the situation confronting this court herein. The jury believed Mr. Turner on the charge of larceny. It was their sole province to determine the facts. For all the foregoing reasons, the judgment and sentence herein is affirmed.

JONES, P. J., and POWELL, J., concur.